GENERAL ELECTRIC CO. v. RICHMOND STREET & INTERURBAN RY. CO.

(Circuit Court of Appeals, Seventh Circuit. December 2, 1909.)

No. 1,575.

1. PATENTS (§ 136*)—REISSUES—AUTHORITY TO GRANT.

To authorize the Commissioner of Patents to grant a reissue under Rev. St. § 4916 (U. S. Comp. St. 1901, p. 3393), either the original specification must be defective or insufficient, or the original claims must embrace more than the patentee had a right to claim as new.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 198½; Dec. Dig. § 136.*]

2. PATENTS (§ 144*)—REISSUES—REVIEW OF FINDINGS OF COMMISSIONER.

Findings by the Commissioner that a legal condition exists and is available to authorize the granting of a reissue are conclusive in so far as they depend upon credibility and weight of evidence, but in so far as they depend upon the legal interpretation and effect of admittedly genuine documents or other undisputed evidence they are reviewable in court.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 215–217; Dec. Dig. § 144.*]

3. PATENTS (§ 136*)—REISSUES—VALIDITY.

A reissue patent applied for, not for the purpose of narrowing the original patent because the patentee had claimed too much, but for the purpose of giving him a broader monopoly, and the claims of which as recast have that effect, is unauthorized and void.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 198½; Dec. Dig. § 136.*]

4. PATENTS (§ 328*)—VALIDITY OF REISSUE—ELECTRIC CONTROLLER.

The Potter reissue patent, No. 12,241 (original No. 524,396), for a controller for electric motors, is void as broader than the original as to certain of the claims and unauthorized.

─────────────
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the Circuit Court of the United States for the District of Indiana.

Suit in equity by the General Electric Company against Richmond Street & Interurban Railway Company. Decree for defendant, and complainant appeals. Affirmed.

Appellant's bill for alleged infringement of claims 1, 2, 5, 10, 11, 12, and 13 of reissue No. 12,241, July 19, 1904, to Potter, appellant's assignor, was dismissed for want of equity. The original patent was No. 524,396, August 14, 1894, for improvements in controllers for electric motors.

The claims of the original, corresponding to the claims of the reissue in suit, together with the drawing and descriptive matter explanatory of certain features of the invention, were as follows:

FIG. 7.

"For interrupting any arc which may be formed upon breaking contact between any of the fingers, I, and the contact plates H, I have provided an electro-magnet, K, which is placed in the inclosing case adjacent to the switch-cylinder at its middle point and which is provided with a pivoted pole piece, N, extending laterally in each direction from the core of the magnet, and terminating at a point adjacent to the line of contact fingers, I. The opposite end of the magnet core rests against the back plate of the inclosing case, so that the latter forms a part of the magnetic circuit. A ridge, O, is cast on the back plate of the inclosing case, D, at a point opposite the pivoted pole piece, N. By this arrangement, the point at which the circuit is broken between fingers I and contact plate H is directly in the line of the magnetic circuit, and any arc will be interrupted, but to assist the magnetic effect upon the arc, I have provided at each finger, I, an arc deflector, P, consisting of a small chute or chimney of insulating material into which the arc is forced by what may be termed the 'magnetic blast.' This deflector, P, is constructed of two strips, $p^1$, $p^2$, of fiber, placed transversely to the line of any arc that would be formed, the latter being bolted to the pivoted pole piece, N, and the two strips separated by a series of small partitions, $p^3$, which divide the space between the two strips into a series of cells which form the chutes above referred to. The partitions, $p^3$, have each two prongs curved to fit the circumference of the insulating cylinder, G, as shown in Fig. 7, so that they may also assist in separating the successive contact plates H. It is obvious that the deflector,

P, and pole piece, N, to which it is attached can be readily swung outward as indicated by the dotted lines in Fig. 7, so as to give ready access to the interior of the mechanism. The pivoted pole piece is normally held in position by a set screw, k."

"1. The combination in an electric controller, of a switch having a multiplicity of contacts and a blow-out magnet having a common pole piece extending from a common core to points adjacent to the several circuit-breaking points of the switch.

"2. The combination in an electric controller, of a cylindrical switch having a series of insulated contact plates adapted to engage with a corresponding series of stationary contact fingers and a magnet having an extended pole piece reaching to points adjacent to the several circuit-breaking points between the said fingers and the said plates."

"5. In a series-parallel controller, a series of contacts upon a cylinder, a series of fixed contacts co-operating with them, and a series of insulating septa carried upon an arm and adapted to be interposed between the contacts, as described."

"10. The combination with a switch, of a magnet having its poles adjacent to the contact-breaking points of the switch, and an arc deflector also adjacent to the contact-breaking points of the switch.

"11. The combination with a switch, of a magnet having its poles adjacent to contact-breaking points of the switch, and an arc deflector consisting of a chute or chimney also adjacent to the contact breaking points of the switch.

"12. The combination with a switch of a magnet having its poles adjacent to contact-breaking points of the switch, and an arc deflector consisting of a chute or chimney also adjacent to the contact-breaking points of the switch, and having its walls placed transversely to the line of the arc.

"13. The combination with a switch having a multiplicity of contact-breaking points, of a magnet having its poles adjacent to said points, and an arc deflector consisting of a series of chutes or chimneys adjacent to the respective circuit-breaking points."

In the reissue, all the drawings and the wording of claims 1, 2, and 5 remained the same as in the original. Claims 10, 11, 12, and 13 and the description pertaining thereto were changed to read thus:

"For interrupting any arc which may be formed upon breaking contact between any of the fingers, I, and the contact plates, H, I have provided an electro-magnet, K, which is placed in the inclosing case adjacent to the switch-cylinder at its middle point and which is provided with a pivoted pole piece, N, extending laterally in each direction from the core of the magnet and terminating at a point adjacent to the line of contact fingers, I. The opposite end of the magnet core rests against the back plate of the inclosing case, so that the latter forms a part of the magnetic circuit. A ridge, O, is cast on the back plate of the inclosing case, D, at a point opposite the pivoted pole piece, N. Carried by the pole piece, N, is a box, P (see Figs. 1 and 7 ), constructed of two longitudinally-extending strips, p¹ p², of insulating material. Supported between these two strips, p¹ and p², are a series of insulating septa, p³, having extensions shaped, as shown in Fig. 7, to conform to the curvature of the cylinder and adapted when the pole piece, N, is in the position shown in full lines to lie between the several contact plates, H.

"The operation of this arc-interrupting device is as follows: Any arcs which occur between the contact plate, H, and the fingers, I, are forcibly driven by the magnetic field against the insulating septa or deflectors, p³, which are placed transversely to the line in which the arc is blown by the magnet, and said arcs are thereby spread out on the surfaces of said septa or deflectors and cooled or smothered. The insulating strips, p¹ p², serve to confine the heated gases constituting the arcs, and the chutes formed by the septa, p³, and the strips, p¹ p², carry the heated gases away from the switch-cylinder. The whole arrangement serves to confine and extinguish the arcs in the limited space available in a compact controller. The pivoted pole piece, N, and the parts carried thereby may be swung outward, as indicated in dotted lines in Fig. 7, so as to give ready access to the interior of the mechanism. It is, however, normally held in position by the set screw, k."

"10. The combination with a switch, of a magnet having its poles adjacent to the contact-breaking points of the switch, and an arc deflector also adjacent to the contact-breaking points of the switch, so placed that an arc between the contact-breaking points is driven against the same by the influence of the magnet.

"11. The combination with a switch, of a magnet having its poles adjacent to contact-breaking points of the switch, a deflector located transversely to the line of the arc as driven by the influence of the magnet, and a chute or chimney for confining and conducting away the heated gases constituting said arc.

"12. The combination with a switch, of a magnet having its poles adjacent to contact-breaking points of the switch, a transverse deflector against which an arc between the contact-breaking points is driven by the influence of the magnet, and a chute or chimney having walls placed transversely to the line of the arc for confining and conducting away the heated gases constituting said arc.

"13. The combination with a switch having a multiplicity of contact-breaking points, of a magnet having its poles adjacent to said points, transverse deflectors against which the arcs between the contact-breaking points are driven by the influence of the magnet, and a series of chutes or chimneys for confining and carrying away the heated gases constituting said arcs."

The showing, on which the reissue was granted, consisted of the subjoined affidavit:

"William B. Potter, being duly sworn, deposes and says:

"That he verily believes himself to be the original and first inventor of the improvements set forth and claimed in the foregoing specification, and for which improvements he solicits a patent; that he does not know, and does not believe, that the said improvements were ever before known or used; that he is a citizen of the United States of America, and resides at Schenectady, in the county of Schenectady, state of New York; that he verily believes that the letters patent No. 524,396, referred to in the foregoing petition and specification, and herewith surrendered, are inoperative by reason of a defective and insufficient specification; and that such defect and insufficiency consists particularly in that the specification of said patent does not describe, with sufficient definiteness, or accuracy, the action of the magnetic arc-extinguishing device, and in that the term 'arc deflector,' used in the specification, and in claims 10, 11, 12, 13, and 14, is indefinite and ambiguous.

"In lines 31 to 43, of page 2 of said patent, it is stated: 'To assist the magnetic effect upon the arc, I have provided at each finger, I, an arc deflector, P, consisting of a small chute or chimney of insulating material into which the arc is forced by what may be termed the magnetic blast. This deflector, P, is constructed of two strips, p1, p2, of fiber, placed transversely to the line of any arc that would be formed, the latter being bolted to the pivoted pole piece, N, and the two strips separated by a series of small partitions, p3, which divide the space between the two strips into a series of cells which form the chutes above referred to.'

"The fact is that the arcs formed between the contact-breaking points are not, properly speaking, dissipated by being forced into the chimneys or chutes, but by being driven, by the effect of the magnet, against the insulating septa or transverse deflectors, p3, which are shown as forming two sides of said chutes, and are flattened out, cooled, and extinguished thereby. The chutes formed by the deflectors, p3, and the strips, p1 and p2, serve to confine the arc and conduct away the heated gases.

"The above-quoted language in the specification renders the term 'arc deflector' indefinite and inaccurate in meaning, and would perhaps lead one to suppose that such deflectors are necessarily complete chutes, which is not so intended, and the claims 10, 11, 12, 13, and 14, in which this term occurs, are thereby rendered ambiguous.

"Deponent further says that the errors which render said patent inoperative arose from inadvertence, accident, or mistake, and with no fraudulent or deceptive intention on the part of deponent; that the following is a true specification of the errors which it is claimed constitute such inadvertence,

accident, or mistake relied upon, and of the manner in which they arose: At the time deponent made the invention disclosed in the said letters patent, he was employed by the General Electric Company, and was engaged in perfecting the electric railway controllers manufactured by that company; the improvements disclosed in said letters patent were embodied in controllers built under deponent's direction, for that company, and the patent department of the said General Electric Company was instructed to, and did, prepare the application on which the said letters patent were granted, and the ambiguities in the specification arose in that department.

"Deponent further says that he is informed and believes that, under the direction of the General Electric Company, the assignee of the above-mentioned letters patent, suit was brought on the said letters patent; that during the progress of that suit a large amount of testimony was taken, and the prior art, and the specification of said letters patent, were carefully and elaborately examined, and the said examination discovered the above-mentioned errors or ambiguities; that he is now informed by the attorneys for the General Electric Company that it is desirable to reissue the above-mentioned letters patent for the purpose of correcting these errors or ambiguities."

The section of the statute that authorizes a reissue reads in this wise:

"Sec. 4916. Whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the Commissioner shall, on the surrender of such patent and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification to be issued to the patentee, or, in the case of his death or of an assignment of the whole or any undivided part of the original patent, then to his executors, administrators, or assigns, for the unexpired part of the term of the original patent. Such surrender shall take effect upon the issue of the amended patent. The Commissioner may, in his discretion, cause several patents to be issued for distinct and separate parts of the thing patented, upon demand of the applicant, and upon payment of the required fee for a re-issue for each of such reissued letters patent. The specifications and claim in every such case shall be subject to revision and restriction in the same manner as original applications are. Every patent so reissued, together with the corrected specification, shall have the same effect and operation in law, on the trial of all actions for causes thereafter arising, as if the same had been originally filed in such corrected form; but no new matter shall be introduced into the specification, nor in case of a machine-patent shall the model or drawings be amended, except each by the other; but when there is neither model nor drawing, amendments may be made upon proof satisfactory to the Commissioner that such new matter or amendment was a part of the original invention, and was omitted from the specification by inadvertence, accident, or mistake, as aforesaid." 16 Stat. 205 (U. S. Comp. St. 1901, p. 3393).

L. F. H. Betts, for appellant.

Thomas F. Sheridan and Clifton V. Edwards, for appellee.

Before GROSSCUP, BAKER, and KOHLSAAT, Circuit Judges.

BAKER, Circuit Judge. Without the existence of one or the other of two conditions precedent, the Commissioner of Patents is not authorized to grant a reissue. Either the original specification must be defective or insufficient, or the original claims must embrace more than the patentee had a right to claim as new. But neither condition is available unless the error arose from inadvertence, accident, or mistake, and without any fraudulent or deceptive intention.

Findings by the Commissioner that a legal condition exists and is available are conclusive in so far as they depend upon credibility

and weight of evidence; but, in so far as they depend upon the legal interpretation and effect of admittedly genuine documents or other undisputed evidence, they are reviewable in court.

In Potter's application the Commissioner's jurisdiction to grant a reissue was invoked on the grounds that the original specification did not describe with sufficient definiteness or accuracy the action of the magnetic arc-extinguishing device and that the term "arc deflector" as used in the specification and in claims 10, 11, 12, and 13 was uncertain and ambiguous.

The original stated that the arc was forced into "arc deflector, P, consisting of a small chute or chimney of insulating material" by the action of what might be termed the "magnetic blast," and further that: t

"This deflector, P, is constructed of two strips, $p^1$ $p^2$, of fibre, placed transversely to the line of any arc that would be formed, the latter ($p^2$) being bolted to the pivoted pole piece, N, and the two strips separated by a series of small partitions, $p^3$, which divide the space between the two strips into a series of cells which form the chutes above referred to."

While the language of this description is subject to the criticism of being awkward in construction and ungrammatical, yet, when it is read in the light of the drawings, the conclusion becomes clear, beyond cavil, that "arc deflector P" is a chute or chimney consisting of four walls—two that might be called side walls, $p^1$ and $p^2$, a back wall, $p^3$, and a front wall, $p^3$.

The reissue stated that the arc was driven by the magnetic field against "deflector $p^3$," and that the "heated gases constituting the arc" were thence carried away from the switch cylinder through a small chute or chimney. By reference to the drawing and description of the reissue, it will be apparent that the chimney consisted of four walls—the same, $p^1$, $p^2$, $p^3$, and $p^3$ as in the original. That is, in both the original and the reissue there are found the same arc, the same magnet, the same chimney walls, and the same relations of all these elements to each other. By virtue of those relations, and in obedience to the natural law that the arc is blown in a line perpendicular to the plane in which the line of the magnetic force and the line of the arc intersect, the arc is inevitably blown against the back wall of the chimney, $p^3$. In the reissue the action of the magnetic arc-extinguishing device is fully stated—the arc is driven against the back wall of the chimney and thence up the flue. In the original, simply—the arc is forced into the chimney. The original does not suggest that any other action would be possible than that the arc would first be driven against the back wall. That such would be the action was a fact known to those skilled in the art prior to the time of the original application. So we find that the original specification neither contained erroneous statements of fact nor failed to give a description in such full and clear terms as would enable any person skilled in the art to construct and use the device.

But if appellant, as owner of the original patent, had sought a reissue merely to remove any alleged doubt concerning the sufficiency and accuracy of the explanation of the action of the arc-extinguishing

mechanism, the particular controversy that is now before us would probably never have arisen. That controversy centers on a comparison of the original and reissued claims.

While the amplified explanation of the magnetic action was being made, there was a change of terms, a transition, a dissolving view in which "arc deflector P" faded away and was replaced by "arc deflector $p^3$." The term "arc deflector" was not a fixed term of art, describing a definite and well-known instrument, as the terms "saw," "hammer," "tongs," describe definite and well-known instruments. The term "arc deflector" in original claim 10 can therefore be given only the meaning ascribed to it in the lexicography of the original specification. There the term is defined as meaning the chute or chimney, P, made up of the side walls, $p^1$ and $p^2$, the front wall, $p^3$, and the back wall, $p^3$. In claim 10 of the reissue the term "arc deflector" must likewise be given the meaning ascribed to it in the terminology of the specification of the reissue. There the term is defined as meaning the back wall, $p^3$, against which the arc is driven by the influence of the magnet. That is, claim 10 of the reissue covers the combination of a switch, a magnet having its poles adjacent to the contact-breaking points of the switch, and a wall against which any arc between the contact-breaking points is driven by the influence of the magnet, regardless of how "the heated gases constituting the arc" may subsequently be taken care of (the chimney of the reissue being brought forward as an independent element in claims 11, 12, and 13, but not included at all in claim 10); while original claim 10 is limited to a combination of the aforesaid switch and magnet with the chimney into which the arc is forced by the magnetic blast. Inevitably it follows, we conclude, that the application to recast the claims now under consideration was made, not for the purpose of narrowing the original patent because the patentee had claimed too much, but rather for the purpose of holding a wider monopoly than could have been built up under the invention as described and disclosed in the original patent. Under the teachings of Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783, and other authorities cited,[1] such an attempt must be held futile.

The attempted enlargement of the monopoly clearly applies to claims 10, 11, 12, and 13. To what extent, if at all, claims 1, 2, and 5 are affected by the changes in the specification, or whether those claims are unavailable to appellant by reason of additional defenses interposed by appellee, are questions which we will not consider. The bill was based upon the reissue. And inasmuch as there existed none of

[1] James v. Campbell, 104 U. S. 356, 26 L. Ed. 786; Mahn v. Harwood, 112 U. S. 354, 5 Sup. Ct. 174, 6 Sup. Ct. 451, 28 L. Ed. 665; Coon v. Wilson, 113 U. S. 268, 5 Sup. Ct. 537, 28 L. Ed. 963; White v. Dunbar, 119 U. S. 47, 7 Sup. Ct. 72, 30 L. Ed. 303; Huber v. Nelson, 148 U. S. 270, 13 Sup. Ct. 603, 37 L. Ed. 447; Wollensak v. Sargent, 151 U. S. 221, 14 Sup. Ct. 291, 38 L. Ed. 137; Eby v. King, 158 U. S. 366, 15 Sup. Ct. 972, 39 L. Ed. 1018; Doane & Wellington v. Smith (C. C.) 15 Fed. 459; Peoria Target Co. v. Cleveland Target Co., 58 Fed. 227, 7 C. C. A. 197; Carpenter Straw-Sewing Mach. Co. v. Searle (C. C.) 52 Fed. 809; Carpenter Straw-Sewing Mach. Co. v. Searle, 60 Fed. 82, 8 C. C. A. 476; Horn & Brannen Mfg. Co. v. Pelzer, 91 Fed. 665, 34 C. C. A. 45; Pelzer v. Meyburg (C. C.) 97 Fed. 969.

the conditions precedent to the right of the Commissioner to grant a reissue, the grant is utterly void. General Chemical Co. v. Blackmore (C. C.) 156 Fed. 968.

The decree is affirmed.