McDOWELL v. IDEAL CONCRETE MACH. CO.

(Circuit Court of Appeals, Seventh Circuit, January 5, 1911. Rehearing Denied April 11, 1911.)

No. 1,696.

1. PATENTS (§ 136*)—REISSUES—AUTHORITY TO GRANT—INSUFFICIENCY OF "SPECIFICATION."

In Rev. St. § 4916 (U. S. Comp. St. 1901, p. 3393), authorizing the issuance of a reissue patent where the original is inoperative or invalid "by reason of a defective or insufficient specification," the word "specifica-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tion," by settled construction, may include the claims as well as the technical specifications preceding them.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 198½; Dec. Dig. § 136.*

For other definitions, see Words and Phrases, vol. 7, pp. 6606, 6607.

Grounds for reissue of patent, see note to General Electric Co. v. Richmond St. & I. Ry. Co., 102 C. C. A. 145.]

2. PATENTS (§ 141*)—REISSUES—VALIDITY.

Under the provision of Rev. St. § 4916 (U. S. Comp. St. 1901, p. 3393), that a reissue must be for "the same invention," if a patent claims a combination, such combination constitutes the invention, and the claims cannot be broadened in a reissue by omitting elements therefrom; nor, unless explicitly pointed out as a part of the invention in the specification, and shown to have been omitted through inadvertence, accident, or mistake, can a different combination be claimed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 141.*]

3. PATENTS (§ 328*)—REISSUE—VALIDITY—MACHINE FOR MAKING CONCRETE BLOCKS.

The Borst and Groscop reissue patent, No. 12,578 (original No. 735,938), for a machine for manufacturing hollow concrete blocks, is void for lack of jurisdiction in the commissioner to grant the reissue, the original not being inoperative or invalid.

Appeal from the Circuit Court of the United States for the District of Indiana.

Suit in equity by the Ideal Concrete Machinery Company against Willis H. McDowell. Decree for complainant, and defendant appeals. Reversed.

Reissue patent No. 12,578, December 18, 1906, to Borst and Groscop, owned by appellee, was held by the Circuit Court to be valid and infringed.

The original patent No. 735,938, August 11, 1903, reads as follows, drawings omitted:

"Our present invention relates to improvements in machines for manufacturing hollow concrete building-blocks.

"The principal object of our invention is to provide a cheap, simple, and efficient machine for molding hollow concrete building-blocks so constructed and arranged that the design or configuration of the front face or either end thereof can readily and conveniently be changed or modified at pleasure by the substitution of a single plate.

"Our invention consists of a pivotally mounted mold formed of hinged sections, a pair of horizontally movable cores or plungers for forming the hollow interior of the blocks, an upright supporting-frame on which the molds and movable cores are mounted, and means for moving the said cores into and out of the mold.

"The principal novel feature of our invention resides in the construction of the mold and the arrangement of the movable cores by which the blocks are formed with their face downward, and the configuration thereof can be conveniently changed at pleasure.

"Similar reference numerals in the accompanying drawings indicate like parts throughout the several views, in which:

"Figure 1 is a view of our invention in vertical section taken on the line xx of Fig. 2, and showing in dotted outline the pivotal mold thrown into position for removing the completed block therefrom. Fig. 2 is a plan view of the machine with the movable cores withdrawn from the mold, and also shown in dotted outline in position in the mold, the operating-lever being broken away in part. Fig. 3 is an end of the machine with the supporting-frame broken away, showing the cores in position in the mold and the manner of securing the hinged sections together. Fig. 4 is a perspective view of our invention with the hinged sections of the mold thrown open, the cores withdrawn, and a completed building-block in position thereon ready for removal and the supporting-frame omitted.

"The support for the operating mechanism consists of an upright frame, preferably of metal and having four legs, 1, a rigid top, 2, and a pair of rigid rearwardly-extended horizontal arms, 3, in parallel relation, having their outer ends upturned and rigidly connected by a cross piece or bar, 4, laterally apertured at 5 for the guide-rods, of the movable cores, hereinafter described. The top, 2, has a bracket, 6, on its front face approximately midway of its ends, Figs. 1 and 2, to support the mold when thrown forward.

"The mold consists of a bottom plate, 7, hinged to a side plate, 8, having upon its upper face a plurality of transverse strips, 9 (Figs. 2 and 4), upon which is loosely arranged a plate 10, and to the front edge of which are hinged a pair of plates 11 (Fig. 4), which are provided upon their rear edge with a latch 12, and a plate 13, hinged at its lower edge to the said top 2, having upon its outer face near its opposite ends a proper catch, 14, to form a holding engagement with the said latch, 12, and provided with forwardly projecting lugs, 15, adapted to overlap and engage the adjacent edge of the end plates, 11, when the mold is closed. The plate, 13, has a pair of lateral openings, 16, adapted to snugly admit the longitudinally and horizontally movable cores, 17, in the manner about to be described, and is also provided upon its inner face with a plurality of recesses, 18. The end plates, 11, have upon their inner face a raised portion, 19, to form a recess, 20, at each end of the blocks, although for molding corner-blocks an end plate, 11, is employed in which the raised portion 19 is omitted. To the lower edge of the end plates, 11, and near their rear end is fixed a metal lug, 21, adapted to fit within a corresponding recess, 22, in the lower face of the bottom plate, 7, thereby securing these plates in a holding engagement until the end plates, 11, are disengaged by opening them outwardly, as shown in Fig. 4.

"At suitable points on the supporting-frame are rigidly fixed the pendant ends of the cross-bar, 23, provided upon its upper edge with proper recesses, 24, to loosely receive, support, and guide the cores, 17. These cores, two in number and identical in construction, are mounted in the said recesses, 24, have upon their rear end a fixed guiding-stem, 25, loosely mounted in the said lateral openings in the cross-bar, 4, and are provided upon their forward end with a short stem or projecting lug, 26, adapted to enter the registering openings, 27 and 28, in the adjacent plates, 8 and 10, respectively, when the cores are in position within the mold.

"At any suitable points upon the rear legs, 1, of the supporting frame are provided apertured lugs, 29, in which is rotatably mounted the horizontal shaft, 30, having upon one extended end thereof a fixed upwardly-extended hand-lever, 31, of proper form and dimensions.

"At suitable points on the shaft, 30, are rigidly fixed the lower ends of the actuating-levers, 32, which are pivotally connected to the rear end of the respective cores, 17, by means of a short link, 33 (Fig. 1).

"The operation and manner of employing our invention thus described are briefly stated as follows: The mold is first firmly closed and secured by means of the latches, 12, and lugs, 21, the cores, 17, being withdrawn, as shown in Figs. 1 and 2. The operator now fills the mold up to the bottom of the openings, 16, in the side plate, 13, with the desired material to form the front face of the block, which is generally made with finer and more expensive material, and which may be colored, if desired. While forming this portion of the block, the openings, 16, may be closed in any proper manner, as by a thin metal plate suspended by a flange from the upper edge of the side, 13, or otherwise, after which it is removed, and the cores, 17, are moved forward simultaneously into their position within the mold, as described, by a forward movement of the hand-lever, 31. When the cores are in this position within the mold, their rear ends are firmly supported by the cross-bar, 23, and their forward ends are supported by the respective pins or lugs, 26, which rest within the openings, 27 and 28. The operator now fills up the mold with cement, preferably of coarser grade than that which was first placed therein, to form the front face of the block, as above described, packs it down in a proper manner, and then removes all surplus cement by scraping it off even with the top edge of the mold. To remove the completed block thus formed from our improved machine, the operator first withdraws the cores, 17, from the mold into the position shown in Fig. 1, then disengages the latches, 12,

and then tips block 34 forward with the remaining portion of the mold, as shown in dotted lines in Fig. 1 and in full lines in Fig. 4, being supported in such position by the bracket, 6, after which the ends, 11, are thrown back on their hinges and the bottom plate, 7, is tilted rearward on its hinges. This leaves the completed block 34 resting upon its bottom face upon the removable plate, 10, which in practice is removed with the block to its place of deposit. The block, 34, thus formed has the openings, 35, for the well-known ventilating and sanitary purposes for which hollow building-blocks are designed, has the end recesses, 20, which will of course register with the corresponding end recess of the next adjacent block when laid up in a wall, and has a series of small lugs or beads, 36, upon its upper face to permit a proper layer of mortar between the blocks in the wall and also to aid in protecting the corners of the blocks in handling and laying them into a wall.

"When it is desired to form corner-blocks with our machine, a hinged plate, 11, having plane inner face instead of the one shown, is substituted.

"Having thus described our invention and the manner of operating the same, what we desire to secure by letters patent is:

"1. A hollow-building-block machine consisting of a supporting-frame having a table for the hinged mold, and rearwardly-extended arms for the core-guides: a mold consisting of a rear side plate hinged to the rear edge of said table and having a pair of lateral core-openings, a forward side plate hinged to the forward edge of said table, having a bottom plate hinged to its lower edge, and having end plates hinged to its opposite ends, as shown, and a removable plate arranged adjacent to the inner face of the said forward side plate; a pair of movable cores adapted to enter the mold through the said lateral openings therein; and means for moving said cores into and out of the mold.

"2. In an apparatus of the class described, a supporting-frame having a table upon its front edge and extended arms upon its rear edge for the core-guides: a knockdown mold whose opposite sides are hinged to the said table, and whose outer side has bottom and end sections hinged to its lower edge and ends respectively; means for securing these hinged sections together; a plurality of movable cores adapted to be adjusted into and out of the mold through suitable openings in the said rear side plate; and means for operating the said cores.

"3. In a hollow-building-block machine a knockdown mold formed of hinged sections and consisting of a rear side plate hinged to a fixed base or support and provided with lateral openings for the horizontally-movable cores; a front side plate or section hinged at its lower edge to the said base; a base-plate hinged to the lower edge of said front side plate, end plates or sections hinged to the said front side plate, a removable plate arranged adjacent to the inner face of the said front side plate; and means for rigidly securing the said hinged sections together, as described."

On March 29, 1905, 19½ months after the issuance of the patent, Borst and Groscop, on behalf of appellee, applied for the reissue. Before so applying, appellee had become aware that other machines for making concrete blocks were on the market and could not be suppressed under its original patent.

The drawings, description, and first three claims of the reissue are in the very lines, words, and figures of the original. Eleven new claims were added.

Admitting that appellant did not infringe the original, appellee based its prima facie case on new claims 5, 6, 7, and 12. During the taking of rebuttal, appellee's counsel stated on the record that at the hearing claim 12 would not be relied on. The above cited new claims are the following:

"5. In a building-block machine, the combination of a frame, a longitudinally-movable core carried thereby; and a mold supported by said frame comprising a rear side plate provided with an aperture for the core, a front side plate hinged to said frame, end plates, and a base-plate hinged to the front side plate, said end plates, front side plate and base-plate adapted to be swung forward as a unit until arrested by the frame.

"6. In a building-block machine, the combination of a frame, a longitudinally-movable core carried thereby, a mold supported by said frame comprising a back plate provided with an aperture for the core, end plates, a front side plate and a bottom plate, said bottom plate adapted to be swung up to

vertical position and said front side plate to horizontal position to carry the molded block to discharging position.

· "7. In a building-block machine, the combination of a pivotally-mounted mold formed of hinged sections, a horizontally-movable core for forming the hollow interior of the blocks, a supporting-frame on which the mold and core are mounted, and means for moving said core into and out of the mold, part of said mold being adapted to swing forward to discharge the molded block."

"12. In a building-block machine, the combination of a frame, a mold-box composed of a front section, a removable carrier-plate adjacent thereto and normally forming one of the side walls of the mold, a bottom connected to the front section, a rear section, and hinged end sections; the front section being adapted to turn with the carrier-plate to horizontal position and the bottom section being simultaneously carried to an upright position."

. The affidavits of the inventors invoked the jurisdiction of the Commissioner to grant a reissue, in these words: "That deponent verily believes that the letters patent referred to in the foregoing petition and specification and herewith surrendered are inoperative for the reason that the specification thereof is defective, and that such defect consists particularly in the original patent being inoperative to fully protect the invention set forth in the description and shown in the drawings; and deponent further says that the errors which render such patent so inoperative arose from inadvertence and mistake, and without any fraudulent or deceptive intention on the part of deponent; that the following is a true specification of the errors which it is claimed constitute such inadvertence and mistake relied upon. The claims forming part of the letters patent referred to are too limited in their scope, being unnecessarily restricted by limiting phrases; that such errors so particularly specified occurred as follows: The fourth claim originally filed was incorrectly drawn. A new claim was then substituted and was rejected on the prior art. Canceling this claim without presenting new claims covering the invention fully was an inadvertence and mistake, the inventors relying upon their then attorneys in charge of the original application who have since admitted that they did not recognize the scope of the invention."

What the new fourth claim was, which was drafted in proper form, substituted for the incorrectly drawn original fourth claim, and rejected on the prior art, and the rejection of which was acquiesced in, does not appear from this record.

Some of the differences between appellant's machine and appellee's machine, and their respective modes of operation, may be summarized thus: Appellant's mold is seated directly upon a frame, doing away with appellee's "rigid top 2." Mounted rigidly upon the rear part of appellant's frame is a vertical plate which forms the rear wall of the mold, while the rear wall of appellee's mold is "hinged at its lower edge to said top 2." Appellant's rigid rear wall constitutes the support, by means of hinges, of the two end walls of the mold, while appellee's front wall, which is itself hinged to top 2, constitutes the support, by means of hinges, of the two end walls of the mold. These molds, when ready to be filled, have five walls, namely, the bottom and four sides. Appellant's rear wall carries the end walls and is rigidly attached to the frame: the bottom and front walls are rigidly, but adjustably, attached to each other at right angles, and together, as an integral, are pivotally mounted upon the frame. But appellee's front wall is hinged to the table top, and the bottom wall is hinged to the lower edge of the front wall; and motion of the front wall can be imparted to the bottom wall only while the end walls, attached to the front walls and in closed position, lift up the bottom wall by means of lugs. In operation, after the molds are filled and the cores withdrawn, appellant swings back the end walls upon their hinges affixed to the rigid rear wall (thus dividing the mold into two parts, one part comprising three walls mounted on the frame and the other part consisting of the remaining two walls, as an integral, pivotally mounted on the frame), then turns the pivoted integral forward through an arc of 90 degrees, and finally pushes the bottom wall (now standing upright) back from the molded block by means of its sliding connection with the front wall (now lying horizontally upon the frame), thus freeing the block by three movements; while appellee swings back the rear wall upon its hinges, then turns the remaining

four walls forward, then swings down the end walls, and finally swings down the bottom wall (now standing upright), thus freeing the block by four movements. In appellee's machine each of the five walls is separately hinged; in appellant's, only the two end walls are separately hinged. In appellee's machine, the block remains four-fifths locked in the mold during the turning movement; in appellant's, the block has been three-fifths freed from the mold before the turning movement is begun.

The defenses, made the basis of the assignments of error, are that the reissue claims in suit are an unwarranted expansion of the original patent, are invalid in view of the prior art, and are not infringed by appellant's machine.

Requisites of original applications for patents are stated in section 4888 Rev. St. (U. S. Comp. St. 1901, p. 3383): "Before any inventor or discoverer shall receive a patent for his invention or discovery, he shall make application therefor, in writing, to the Commissioner of Patents, and shall file in the Patent Office a written description of the same and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; and in case of a machine, he shall explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions; and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery. The specification and claim shall be signed by the inventor and attested by two witnesses."

Conditions governing reissues are found in section 4916 (U. S. Comp. St. 1901, p. 3393): "Whenever any patent is inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the Commissioner shall, on the surrender of such patent and the payment of the duty required by law, cause a new patent for the same invention, and in accordance with the corrected specification, to be issued to the patentee, or, in the case of his death or of an assignment of the whole or any undivided part of the original patent, then to his executors, administrators, or assigns, for the unexpired part of the term of the original patent. Such surrender shall take effect upon the issue of the amended patent. The Commissioner may, in his discretion, cause several patents to be issued for distinct and separate parts of the thing patented, upon demand of the applicant, and upon payment of the required fee for a reissue for each of such reissued letters patent. The specifications and claim in every such case shall be subject to revision and restriction in the same manner as original applications are. Every patent so reissued, together with the corrected specification, shall have the same effect and operation in law, on the trial of all actions for causes thereafter arising, as if the same had been originally filed in such corrected form; but no new matter shall be introduced into the specification, nor in case of a machine-patent shall the model or drawings be amended, except each by the other; but when there is neither model nor drawing, amendments may be made upon proof satisfactory to the Commissioner that such new matter or amendment was a part of the original invention, and was omitted from the specification by inadvertence, accident, or mistake, as aforesaid."

Russell Wiles and Philip C. Dyrenforth, for appellant.

Robert S. Taylor, for appellee.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). In General Electric Co. v. Richmond St. Ry. Co., 178 Fed. 84, 102 C. C. A. 138, this court said:

"Without the existence of one or the other of two conditions precedent, the Commissioner of Patents is not authorized to grant a reissue. Either the original specification must be defective or insufficient, or the original claims must embrace more than the patentee had a right to claim as new. But neither condition is available unless the error arose from inadvertence, accident, or mistake, and without any fraudulent or deceptive intention."

In the present case the mistake, if any, did not inhere in the drawings or in the specification (apart from the claims), nor did the patentees claim more than they were entitled to claim as new. So if the word "specification" in the second sentence of the above quotation is to be limited to that part of the patent which precedes the formal claims, this case would be at an end. In the Richmond Case, however, the Commissioner's jurisdiction to grant a reissue was invoked on the grounds that the original specification did not describe with sufficient definiteness or accuracy the action of the magnetic arc-extinguishing device, and that the term "arc deflector," as used in the specification and in claims 10, 11, 12, and 13, was uncertain and ambiguous; and it was therefore unnecessary to state the construction given to the word "specification," which appears in the opinion in exactly the same context as in the statute.

[1, 2] By settled interpretation the word "specification" in the first sentence of section 4916, Rev. St. (U. S. Comp. St. 1901, p. 3393), may cover the entire original patent. The inquiry, therefore, is what are the conditions under which a reissue may lawfully be granted in lieu of an original patent unaltered save by the addition of enlarging claims?

One condition is that, on surrender of the original patent, a new patent "for the same invention" shall be issued. Other conditions, emphasizing the one just stated, are that "no new matter shall be introduced into the specification"; and, the original and reissue here being for a machine, and no model being filed, that "the drawings shall not be amended."

For example if, in a patent for improvements in an old art, the drawings fully exhibit a complete and operative machine made up of 20 elements; the specification (apart from the claims) clearly explains the machine, its working principle and the best mode in which the patentee has contemplated applying that principle, and also particularly points out that the patentee's contribution to the art consists (a) of the combination, in the machine, of elements 1, 2, 3, and 5, (b) of elements 2, 3, 4, and 6, (c) of elements 5, 6, 7, and 9, and (d) of elements 6, 7, 8 and 10 (all in accordance with section 4888 [U. S. Comp. St. 1901, p. 3383]); and the claims distinctly cover (a), (b), and (c)—then there would be a basis for an application for a reissue by showing, say, that claim (d) had been drafted but had been inadvertently omitted by a copyist. Conversely, if claims (a), (b), (c), and (d) were in the original and by mistake some part of the description of the machine had been omitted, or there had been a failure in the statement of invention to include (d), there would be grounds for a reissue. In the first example the patent (partly operative) would be inoperative to protect a part of the invention, described, but not claimed; in the second, claimed, but not explained

and described. In both, there would be a defective or insufficient patent which was inoperative to secure fully to the inventor a monopoly of the subject-matter disclosed in the patent as his invention or inventions.

Continuing the illustration suppose that the original patent, after describing the machine as aforesaid, and particularly pointing out that the invention or inventions consisted in (a), (b), (c), and (d), had distinctly claimed (a), (b), (c), and (d). In what respect is the patent inoperative or invalid? True, the drawings and description showed a machine of 20 elements. But any one on reading the patent would have the right to believe and to act on the belief, so far as the owner of the patent is concerned, that elements 11 to 20, and every combination thereof, were open to free use, and that elements 1 to 10 were open, and also every combination of them except (a), (b), (c), and (d). Now, if the truth was that the inventor in constructing the machine had made new and useful combinations among elements 11 to 20 and also broader inventions than those described and claimed among elements 1 to 10, it would seem that from his point of view they were all one and the same invention or group of inventions. But if enlargement is to come, not from evidence contained in the original patent (or in the proceedings to obtain it), but from what the inventor subsequently says (truthfully or untruthfully) was in his mind prior to filing the original application, a region of danger, of temptation to fraud and deception, would be opened wide which Congress has commanded should be kept closed. For the reissue must be limited to the same invention that the inoperative patent discloses as the invention.

"Reissued letters patent must, by the express words of the section authorizing the same, be for *the same invention*, and consequently where it appears on a comparison of the two instruments, as matter of law, that the reissued patent is not for the same invention as that embraced and secured (attempted to be secured?) in the original patent, the reissued patent is invalid, as that state of facts shows that the Commissioner, in granting the new patent, exceeded his jurisdiction." Seymour v. Osborne, 11 Wall. 516, 544, 20 L. Ed. 33.

"Invalid and inoperative patents may be surrendered and reissued for the same invention, but Congress never intended that a patent which was valid and operative should be reissued merely to afford the patentee an opportunity to expand the exclusive privileges which it secures, to enable him to suppress subsequent improvements which do not conflict with the invention described in the surrendered patent." Gill v. Wells, 22 Wall. 1, 19, 22 L. Ed. 699.

"The original patent was not inoperative nor invalid from any defective or insufficient specification. The description given of the process claimed was, as stated by the patentee, full, clear, and exact, and the claim covered the specifications; the one corresponded with the other. * * * The evident object of the patentee in seeking a reissue was not to correct any defects in specification or claim, but to change both, and thus obtain, in fact, a patent for a different invention." Russell v. Dodge, 93 U. S. 460, 464, 23 L. Ed. 973.

"The Legislature was willing to concede to the patentee the right to amend his specification so as fully to describe and claim the very invention attempted to be secured by his original patent, and which was not fully secured thereby, in consequence of inadvertence, accident, or mistake; but was not willing to give him the right to patch up his patent by the addition of other inventions, which, though they might be his, had not been applied for by him, or, if applied for, had been abandoned or waived."

And at this point the Supreme Court tells such an inventor how he may properly invoke the Commissioner's jurisdiction:

"For such inventions, he is required to make a new application, subject to such rights as the public and other inventors may have acquired in the meantime." Powder Co. v. Powder Works, 98 U. S. 126, 138, 25 L. Ed. 77.

In considering an argument, based on certain general statements in Seymour v. Osborne, that whatever was suggested or indicated in the original specification, drawings or model, was to be considered a part of the invention, even though not stated to be, or described as, a part of the invention the Supreme Court said:

"In these extracts from the opinion it is seen that the court adheres strictly to the view that, under the statute, the Commissioner has no jurisdicion to grant a reissued patent for an invention substantially different from that embodied in the original patent, and that a reissue granted not in accordance with that rule is void. In what is there said about redescribing the invention, and about including in the new description and new claims what was suggested or indicated in the original specification, drawings or patent office model, it is clearly to be understood, from the entire language, that the things so to be included are only the things which properly belonged to the invention as embodied in the original patent; that what that invention was is to be ascertained by consulting the original patent; and that, while the new description may properly contain things which are indicated in the original specification, drawings or patent office model (though not sufficiently described in the original specification), it does not follow that what was indicated in the original specification, drawings, or patent office model is to be considered as a part of the invention, unless the court can see, from a comparison of the two patents, that the original patent embodied, as the invention to be secured by it, what the claims of the reissue are intended to cover." Parker & Whipple Co. v. Yale Clock Co., 123 U. S. 87, 98, 8 Sup. Ct. 38, 44, 31 L. Ed. 100.

"There is no evidence of an attempt to secure by the original patent the inventions covered by the first eight claims of the reissue, and those inventions msut be regarded as having been abandoned or waived, so far as the reissue in question is concerned, subject, however, to the right to have made a new application for a patent to cover them; in other words, those eight claims are not for the same invention which was originally patented." Parker & Whipple Co. v. Yale Clock Co., 123 U. S. 87, 102, 8 Sup. Ct. 38, 46, 31 L. Ed. 100.

"In the present case, the original patent was not inoperative or invalid by reason of a defective or insufficient description of the invention, for the text of the specification of the reissue, aside from the claims, is substantially the same as that of the original. Nor was the application for the reissue made because Tirrell in the original had claimed as his invention more than he had a right to claim as new, for his oath declares that the defect consists in the 'omission of claims.' The object of the reissue was to prevent the patent from being confined to the apparatus illustrated in the drawings and described in the specification of the original, and to enable it to cover apparatus covered by patents issued subsequently to the original." Electric Gas Co. v. Boston Electric Co., 139 U. S. 481, 500, 11 Sup. Ct. 586, 593, 35 L. Ed. 250.

"It was held by the Circuit Court that, while claim 1 of the reissue was not embraced in the original, the matter claimed by that claim was so embraced; that the language of the original specification clearly described the closed-breast furnace; that a furnace built in accordance with the language of the original would be necessarily closed-breasted; that the other element of claim 1 of the reissue, 'where the slag is discharged through an opening or openings cooled by water,' was no less clearly described in the original; that the drawings originally filed showed the same; that claim 1 of the reissue might, therefore, have been embraced in the patent as first issued, or introduced into the reissue without changing the specification; that the change made by the reissue simply expressed the same thing in different terms; that claim 1 of

the reissue was, therefore, not an enlargement of the invention; that such additional claim, omitted through inadvertence, accident or mistake, might be secured by means of a reissue, if applied for within a reasonable time: that in this case the application was made a little after the expiration of one year; and that the question whether the omission occurred through inadvertence, accident or mistake, was a question for the Commissioner of Patents. * * * But the material point is the extension of the invention claimed, by the addition of claim 1 of the reissue, the words of which, 'substantially as set forth,' refer to the new matter in the reissue, that the slag is discharged 'through an opening cooled with water in such a manner that the tymp, or fore hearth, and the stove wall can be dispensed with.' The intention manifestly was to construe the first claim so as to cover any kind of blast furnace with a closed breast, having a slag-discharge opening cooled in any manner or to any extent by water. There is nothing in the original specification which indicates that any such claim was intended to be made in the original patent. On the contrary, the whole purport of that specification shows that it was intended to claim only a slag-discharge piece or cinder block constructed and attached in a specific manner. * * * We are of opinion that the present reissue is invalid, so far as the first claim of it is concerned, because it is not for the same invention as the original patent." Freeman v. Asmus, 145 U. S. 226, 235, 239, 241, 12 Sup. Ct. 939, 941, 36 L. Ed. 685.

[3] Boyle's original patent for an improvement in flushing apparatus for water-closets was granted January 1, 1884. Application for reissue was filed January 2, 1885. Boyle's affidavit stated that the original was inoperative because "the principal claims are defective or insufficient in that they are, or appear to be, limited to combinations embodying the 'flushing-chamber F' as an essential element, whereas that chamber is not essential to his invention in its generic features"; that the original specification stated that his invention introduced "a new principle for operating double-trapped or siphon water-closets, namely, that of producing the requisite vacuum by causing the falling flushing water to act as an injector and draw air along with it"; that in his early experiments he had devised forms in which "flushing chamber F" had no part in the operation; that in describing his invention to his attorney, he did not describe the first constructions devised by him, but only the preferred constructions; that in November, 1884, he noticed a patent to Hanson, "showing Boyle's said invention in a form almost identical with one of the said constructions originally invented by Boyle"; that thereupon he consulted his attorney, who advised him of the defect or insufficiency of his original patent; that, prior to being so advised, he had no suspicion that his patent was defective or insufficient; and that he thereupon instructed his attorney to prepare an application for reissue.

"The opinion of the Circuit Court, in speaking of the contention that the original patent was inoperative to protect the invention intended to be covered by it, said that such patent certainly protected the flushing apparatus that was claimed as a whole in the first claim, and carefully described in the specification; that it protected also all the combinations which were claimed in its several claims; that it was not necessary to change the specifications or drawings to secure fully the apparatus claimed in the several claims of the original patent; that that was the identical apparatus which Boyle intended to manufacture; that, therefore, it could not be said that the original patent was 'inoperative or invalid' in the sense that Boyle could not hold what he claimed, and intended to manufacture, because his original specification was either defective or insufficient; that what Boyle meant by asserting that the original patent was inoperative was only that a particular combination of

parts might have been claimed originally that was not claimed, and that his original patent was inoperative to protect such particular combination, because no right to the protection of it had been asserted. * * * We are unanimously of opinion that these views of the Circuit Court are sound. * * * The defendant had no flushing chamber in any flushing apparatus made by it; and such flushing chamber was an essential element in the specification and drawings of the original patent, and was one of the necessary elements in each of the six claims of the original patent as made." Huber v. Nelson Mfg. Co., 148 U. S. 270, 282, 285, 290, 13 Sup. Ct. 603, 607, 37 L. Ed. 447.

Turning now to the original patent in question, the first thing noted is the admission that machines for manufacturing concrete blocks are old. "The principal object of our invention" is to provide a simple and cheap machine in which the face-design can be changed by the substitution of a single plate. "The principal novel feature of our invention" resides in constructing the mold and cores so that the block is formed face downward. "Our invention consists of a pivotally-mounted mold formed of hinged sections, a pair of horizontally-movable cores or plungers for forming the hollow interior of the blocks, an upright supporting frame on which the molds and movable cores are mounted, and means for moving said cores into and out of the mold." "Our invention" is then particularly described, and next the operation of "our invention" is given, the machine and its mode of operation being as shown in the statement of the case. On this disclosure and declaration of invention were based three claims which fully protected the machine as portrayed in the drawings, as described in the specifiction, as intended to be manufactured by the patentees, and substantially as manufactured by their assignee.

More nearly than the others, claim 6 of the reissue can be read upon appellant's machine, the construction and operation of which have been given in the statement. By its wording claim 6 covers every combination of frame, longitudinally-movable core, and five-plate mold, in which the "bottom plate is adapted to be swung up to vertical position and the front plate to horizontal position to carry the molded block to discharging position." Whereabouts in the original patent is there any disclosure that appellant's machine, or its mechanical equivalent, was the invention of Borst and Groscop? Not in the original claims, for if appellant's machine were the mechanical equivalent of the claimed machine, it would not have been necessary to apply for a reissue in order to maintain an injunction suit. Not in the original drawings, for they picture accurately appellee's machine and nothing else. (To enable the drawings to disclose appellant's machine or its mechanical equivalent, it would be necessary to violate the command that "the drawings shall not be amended.") Not in the original description of the construction and mode of operation, for it describes accurately the construction and mode of operation of appellee's machine and nothing else. (To enable the specification to point out the construction and mode of operation of appellant's machine or its mechanical equivalent as being the invention of Borst and Groscop, as being something beyond the mere mechanical equivalent of the machine which they had already particularly pointed out and distinctly claimed, it would be necessary to violate the command that "no new

matter shall be introduced into the specification.") Nowhere is found any suggestion that the rear wall, with end walls hinged thereto, may be rigidly affixed to the frame, and that the bottom and front walls may be rigidly affixed to each other and mounted upon a single pivot. No intimation that the block may be carried to discharging position three-fifths free of the mold, instead of four-fifths locked in the mold. Not even an obscure hint that other forms of concrete block machines (beyond mere mechanical equivalents of the form particularly pointed out and distinctly claimed) had ever been devised or even thought of by Borst and Groscop, unless such a hint is lurking in their statement that "our invention consists of a pivotally-mounted mold formed of hinged sections," with cores and supporting frame. Appellee's mold is formed of hinged sections, each of the five separately movable upon its hinge. Only two of appellant's sections are separately movable. Appellee's mold, as an entirety, is not "pivotally-mounted," but the description points out that all of the walls, except the rear one, move forward as a unit, and so the general statement is essentially true when applied to appellee's machine. There is no teaching that during the movement of the moist and plastic block the end plates are not necessary. The general statement should be read as a part of the entire document. and, so read, it applies to appellee's machine and nothing else. If appellant's machine were covered by a patent, it would be a pretty reckless expert who would cite Borst and Groscop's aforesaid general statement of invention as an anticipatory disclosure of appellant's invention.

In the Freeman Case, supra, the drawings and specification of the original patent showed and described the features embodied in the re-issue claim. But they were shown and described as parts of a blast furnace, not as parts of the patentee's invention of improvements in blast furnaces. And because neither statement nor claim of invention (either perfectly or defectively made) pointed out the added features, the reissue was declared void. Here, appellee is in a weaker position, for neither drawings nor specification showed appellant's machine or its mechanical equivalent.

In the Huber Case, supra, the inventor, before applying for his patent, made a device like the one which the defendant subsequently adopted. And in his original specification he stated that his invention introduced "a new principle for operating double-trapped or siphon water-closets, namely, that of producing the requisite vacuum by causing the falling flushing water to act as an injector and draw air along with it." The inventor's first form of device, his patented form, and the defendant's form, equally employed the "new principle." But because the inventor, in his original patent, showed no way of employing the "new principle" except by the use of a combination in which a flushing-chamber was an essential element, the enlarged claims of the reissue were struck down. Here, appellee is still weaker. There is no claim that Borst and Groscop, before applying for their patent, ever in fact made a machine of the form and mode of operation of appellant's machine. And their original specification did not contain even a

general statement of "a new principle for operating" concrete block machines which was common to the two.

We hold that the original patent was not inoperative or invalid; that the reissue claims in suit were not for the same invention that was meant to be, and was, in fact, secured by the original patent; and that the Commissioner was therefore without jurisdiction to grant the reissue.

The decree is reversed, with the direction to dismiss the bill for want of equity.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 206–213; Dec. Dig. § 141.*]

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 211; Dec. Dig. § 141.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes