GENEVA MFG. CO. et al. v. NATIONAL FURNITURE CO. et al.

(Circuit Court, N. D. Illinois.  March 27, 1911.)

No. 29,138.

1. PATENTS (§ 311*)—SUIT FOR INFRINGEMENT—CONSTRUCTION OF BILL.
   Where the complainants in a suit for infringement explicitly state in their bill that all infringements by defendant were since a certain date, when they became assignees of the patents in suit and rights thereunder, general allegations in an amendment that defendant has infringed at divers times since the patents were issued do not entitle complainants to prove infringements prior to the time alleged in the original bill.
   [Ed. Note.—For other cases, see Patents, Dec. Dig. § 311.*]

2. PATENTS (§ 138*)—REISSUES—VALIDITY.
   A reissue patent issued on an application filed as soon as the patentee discovered that his original claims had inadvertently been made too broad, and which narrows them to his actual invention, is valid.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 201–203; Dec. Dig. § 138.*
   Grounds for reissue of patent, see note to General Electric Co. v. Richmond St. & I. Ry. Co., 102 C. C. A. 145.]

3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—SOFA BEDS.
   The Rolph reissue patent, No. 11,831 (original No. 585,122), the Weyer patent, No. 624,591, and the Rolph patent, No. 637,976, all relating to sofa beds, are valid and meritorious, but do not disclose any new principles or modes of operation, being merely combinations of old elements in a new relation by which their operation is improved. As so construed

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

*held* not infringed by the structure of the Deimel patent, No. 863,365, which embodies some, but not all, of the same elements, and has a different mode of operation.

In Equity. Suit by the Geneva Manufacturing Company, S. Karpen & Bros., and the Seng Company, against the National Furniture Company and the Deimel Sofa Bed Fixture Company. On rehearing. Decree for defendants.

Dyrenforth, Lee, Chritton & Wiles, for complainants. .
William R. Rummler and John W. Hill, for defendants.

SANBORN, District Judge. This is a suit brought June 23, 1908, for the alleged infringement of the Rolph reissue patent of June 19, 1900, No. 11,831, the Weyer patent of May 29, 1899, No. 624,591, and the Rolph patent of November 28, 1899, No. 637,976, relating to sofa beds. The Pullman car seat, which is a seat in the daytime and a bed at night, illustrates in a general way the structure in question here. Back and seat are hinged or pivoted together, so that when the double seat is pulled down the two opposite seats with the backs assume a horizontal position. It is remarkable that no improvement has been made in the Pullman car bed seat since Field and Pullman took out their patent in 1865. In the advanced sofa bed structures of to-day, to make up the bed the operator stands in front of the sofa, takes hold of the front of the seat, raises or pulls it out, thereby uncovering the bedding box arranged in the base position under the seat, and permitting access to the mattress and bed clothing. These are then taken out, and the seat raised to the perpendicular. The back portion, being all the time locked to the seat portion, is thus lowered to the horizontal, with the seat standing at right angles. By tilting the latter slightly backward, the two parts are unlocked, and the seat let down to the same horizontal plane of the back, so that the bed may be then made up. In the latest Rolph patent, called the "Rolph Automatic," the bedding box is automatically moved out when the seat is raised, so as to render the bedding more accessible. This is done by a system of links and pivots, connecting base, bed box, back, and seat, so that they all move as a unit when force is applied to seat, back, or bedding box. This feature is not present in defendants' sofa bed known as its fourth construction. Another important distinction between the two results from this form of construction. Defendants' seat and back portions are not mechanically joined or connected to the base or bed box portion, but slide or roll on small wheels resting on short tracks laid on the upper edges of the ends of the base portion, just as a hand car may be rolled along a railroad track when one end is lifted up. In other respects defendants' sofa bed is the same as that of complainants. Thus the question whether these differences enable defendants to escape infringement is presented, and is the important question in the case.

Sofa beds are said to be one of the necessities of life in flats and dwellings with small rooms, where economy of space is essential. Their manufacture is estimated to represent about a million and a quarter dollars a year. To a considerable extent they are replacing the folding bed, which is useless by day and is supposed to have a

tricky habit of shutting up without reason or warning, even when securely locked. Sofa beds should possess certain highly useful and desirable features, among which are the capacity to hold the bedding, and make it easily accessible for use, of being made up and put back by a person standing in front, and without pulling the sofa away from the wall or pushing it back to the wall, using the seat as a means of raising or lowering the back in converting from sofa to bed or vice versa, ability to lock the seat and back together, so they will swing as a unit, and to lock and unlock them automatically by merely tilting the seat, using the weight of the back to counterbalance the seat, and employing seat and back for the bed surface. As complainants' expert well says:

"All the progress of the art indicates that the desideratum is to quickly and easily increase the available bed surface by the extent, at least, of the size of the back."

As in most of the practical arts, sofa beds have had a period of growth and development, until they are supposed to have reached perfection. Before the inventions of Rolph and Weyer (now owned by complainants) a number of the desirable features referred to had been discovered and utilized by other patentees. Most of the elements found in the three patents in suit were old. The general form of sofa bed was well known. This comprised a base, bedding box, seat, and back portions hinged together (as in the Pullman car), locking means to hold seat and back at right angles to each other or in any other position, capability of front operation, automatic movement of base portion to the rear to support the back when horizontal, guideways or tracks for guiding the forward and backward movement of back and seat as a unit, and rollers or wheels pivoted to run on the tracks or ways. All these are found in the prior art, though Rolph and Weyer have so combined the best of these pre-existing separate elements, and so improved them, and as to some have so enlarged and extended their functions that they have made a considerable advance in the art. Fixtures of the patented structures sufficient to make a million and a quarter dollars worth a year are now being marketed. Conceding practical merit, commercial success, and meritorious advance in the art, it is further claimed by complainants that a new principle of operation was introduced, so as to bring the case within the rule of Winans v. Denmead, 15 How. 330, 14 L. Ed. 717, Vrooman v. Penhollow, 179 Fed. 296, 102 C. C. A. 484, and like cases. Novelty is denied by defendants; but, if that be found, they urge that the differences referred to so distinguish the various structures as to avoid infringement. Validity of the Rolph reissue is also denied, chiefly on the ground that it was not applied for in proper time.

The main question just stated relates to defendants' fourth construction, so called, commenced in 1907. Another question presented relates to the first, second, and third constructions, made in 1901, 1902, and 1903. As to these there is no question of infringement, if the bill of complaint, and proposed amendments thereto, cover these earlier infringements; so that this branch of the case presents only a question of the construction of a pleading. In order to properly un-

derstand these allegations, it is necessary to refer to certain assignments, transfers, and licenses by the patent owners, substantially as follows: All of the patents were assigned to complainant Geneva Company, by various mesne transfers, August 21, 1903. The assignments, and all of them, are alleged in the bill to have been "prior to the acts of infringement hereinafter complained of." Litigation arose between the complainants in respect to these patents, and certain others, which was settled by an agreement providing that the Geneva Company should have certain exclusive rights under all the patents, complainant S. Karpen & Bros. should have certain other exclusive rights thereunder, and complainant Seng Company should have the exclusive right to sell fixtures under the Karpen patent (not here involved), and the Weyer patent. This agreement for exclusive rights was made December 12, 1904. The proofs thus show acquisition of title to the patents by one of the complainants, the Geneva Company, on August 21, 1903, and the making of exclusive licenses to the other complainants, as well as the retention of exclusive rights by the owner, the Geneva Company, on the 12th of December, 1904.

In respect to infringement, the original bill, together with certain proposed amendments (indicated by italics), contains the following: After August 21, 1903, and since the patents issued in 1899 and 1900, and since the acquisition of such exclusive rights December 12, 1904, at divers times and occasions *since the grant of said patents and each of them and* prior to filing the bill, *and also at divers other times and occasions since the grant of the patents and within six years of the filing of the bill,* defendant National Company has infringed, and since December 12, 1904, defendant Deimel Company has made and sold fixtures infringing the patents, and is a contributory infringer. It further appears that on May 22, 1908, the patentees assigned to complainants all choses in action arising out of prior infringement to complainants jointly.

Defendant National Company commenced its first, second, and third constructions in 1901, and continued them until March or April, 1903. All these were infringements of complainants' patents, or some of them. It further appears that from 1902 to 1907 complainant Seng Company sold to National Company 13,219 sets of the unpatented fixtures going with the patented sofa beds covered by complainants' patents. These sales were made with the expectation that the fixtures should be used by the National Company in complete sofa beds of the kinds covered by the patents in suit; but the Seng Company did not know whether or not such complete sofa beds were of the same general style as the patented structures. In an agreement made November 10, 1900, between the owners of the Rolph reissue and the Karpen patent, it was provided that the National Company should not be licensed under those patents; but, after the infringements by the first three constructions in 1901 to 1903, the Seng Company induced the National Company to adopt its fixtures, whereupon the latter company "did discontinue making the devices which we (Karpen and Seng) considered infringements, and used only the devices which they (National Company) purchased from the Seng Company." The

National Company paid royalty on these fixtures. Sofa bed fixtures can be supplied to the trade by the Seng Company, sufficient to meet all demands, and the annual business in sofa beds made with these fixtures is estimated at $1,250,000, being furnished to nearly every sofa bed manufacturer in America.

From the facts stated, and under the pleadings, it is contended by defendants that they cannot be held for any infringement by the first three constructions, and they moved to strike out all evidence relating thereto.

[1] 1. Infringement by first three constructions is not within the amended bill. With all the general allegations of infringement at divers times and occasions, and within six years of bringing suit, there is nowhere any negation of the prior averments that the transfers of August, 1903, were prior to all acts of infringement, or that such acts were since December, 1904, when the agreement creating exclusive rights was entered into. Here are positive and definite statements that no infringement is claimed after certain dates. Even a liberal construction of the general allegations, and having in mind that the latter were brought in by amendment, will not overcome such explicit averments. This construction is aided by the evidence referred to, showing that the National Company was persuaded to stop the earlier infringement, purchase the patented fixtures to the extent of 13,000 sets, and pay royalty thereon. This indicates complainants' purpose not to sue for the prior infringements. No suit was actually brought for five years. It is indeed true that the National Company abandoned the purchase of the fixtures, and put out its fourth construction, thus affording some reason for saying that circumstances had so changed that it would not be inequitable to hold the National Company for its earlier infringement. If the fourth construction were a palpable infringement, there would be much force in this suggestion; but there is no reason for doubt that defendants regard their last construction so distinguishable from the Rolph and Weyer designs, and so close in track and roller construction to the Hale patent of 1897, No. 595,913, as to justify them in adopting it. Moreover, they are operating under the Deimel patent of 1907, No. 863,365, which seems on its face to authorize their specific fourth construction. Entirely apart from these considerations, however, complainants' positive allegations that the assignments of August, 1903, were prior to any infringement, and that all infringement has been since 1904, clearly show an unmistakable intention to claim nothing for the earlier infringements, and treat them as satisfied.

[2] 2. Validity of the Rolph and Weyer patents: All the patents in suit are meritorious and valid. Rolph applied for the reissue just as soon as he discovered that his original claims had inadvertently been made too broad. The reissue limits them, and the new claims conform to his actual invention. It was within the express terms of the statute, and no good reason can be discovered for refusing its validity. Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658; Moneyweight Scale Co. v. Toledo Computing Scale Co., 187 Fed. 826; McDowell v. Ideal Concrete M. Co., 187 Fed. 814.

[3] In regard to all three patents, it is claimed they introduced a new mode of operation, and are therefore entitled to liberal construction, and a reasonably wide range of equivalents. Rolph, it is said, conceived the idea of employing the seat as a medium for manipulating the back, both in changing from sofa to bed and vice versa. The back and seat are thus made to counterbalance each other, resulting in easy operation from the front, rendering it unnecessary to go behind the structure. This new method of complainants' three patents was not wholly secured by locking seat and back together, which many others had done, but in discerning the possibility and great importance of using the balanced seat as the center of the system, and building around this feature very much that is valuable in the present day art. If this were new with Rolph, it would show a high degree of invention, and be entitled to liberal protection. Rolph, however, had no automatic means for unlocking the mechanism, using for that purpose a pull on a rope. Weyer supplied this defect by again using the seat to do the unlocking, thus utilizing and improving on Rolph by employing the same central feature of seat manipulation to carry out the original conception. As yet, however, no means, it is said, had been discovered to avoid moving the sofa bed away from the wall when changed to bed form, and pushing it back when restored to sofa form. This feature was supplied by Rolph himself in the third patent sued on, called the "Rolph Automatic." In this final form the seat, back, base, and bed box are so tied together by an ingenious arrangement of pivoted levers or thrust links that when the locked seat and back are moved as a unit, up or down, the bed box will move automatically with them. Upward movement of the seat pulls the back away from the wall, and downward movement towards the wall. There is not the slightest doubt of the validity of these three patents, nor of their complete operativeness, utility, and well-deserved commercial success. It is, however, equally apparent that they did not introduce any new mode of operation, but are simply to be classed as exceedingly meritorious combinations of old elements co-operating to produce new and improved results.

The new mode of operation asserted, by which the seat is made to operate the back as in the Rolph reissue, and which is the central idea of the whole Rolph-Weyer system, is most certainly found, and most explicitly described and illustrated, in the German patent for a single sofa bed, issued to Felix Breyer, September 8, 1890. The inventor says that:

"The back is connected with the sitting frame by triangular links c in such manner that on turning over the seat for forming the bed it lays itself under the same, but straightens itself up again automatically when the seat comes uppermost again."

The object of the inventor being to construct a single, instead of a double, bed, there is, of course, no attempt to arrest the movement of the back when it reaches the horizontal, but simply to get it out of the way, below the horizontal seat and bed surface; but the central Rolph principle, which is automatic movement of all other parts by seat manipulation alone, is so unmistakably present, and so fully

illustrated and described in this German patent, as to remove Rolph's invention, good as it was, from the field of newly discovered principles or modes of operation. Nor does the record show any other new method of operation, simply a practical and meritorious combination of old means in a new relation with beneficial results, and better operation.

3. Does defendants' fourth construction infringe? In order to fully apprehend this question, it is necessary to state the elements which work together in the Rolph, Weyer, and Deimel constructions to produce the results obtained. In the reissue these co-operating elements are the base box, seat, back, uprights, or standards rising from the base box, seat, and back pivoted or hinged on the uprights, and locked together, and unlocking means (shown to consist of a releasing lever worked by a rope, chain, or strap). All that Weyer did was to dispense with the hand manipulated rope, chain, or strap, and so change the locking devices that they could be locked and unlocked by tilting the seat when it is close to a right angular position in respect to the back. And all that Rolph added by his last patent was to so connect seat, back, and base that when the seat is lifted the back will move outward, away from the rear of the frame, or from the wall, and the bedding box will do the same. Thus, there are seven elements in Rolph's reissue, seven in Weyer, and eight in Rolph's automatic device.

Turning now to defendants' fourth construction, we find eight elements, only five of which at first sight are in the three patents in suit. There are no uprights or standards rising from the base box, nothing hinged or pivoted thereon, no connection whatever between base and seat or back, except as everything on the earth is connected with the earth by the attraction of gravitation. Defendants have indeed taken over bodily the cardinal principle of the Rolph invention, the automatic and balanced control of the sofa back by means of the seat, and the locking and unlocking of seat and back by the same means. But for the uprights defendant has substituted a railroad, and for hinges or pivots carried by the uprights it has car wheels. Moreover, it took its railroad from Hale, Field & Pullman, Marso, and Breyer, all in the prior art. Deimel put it together with other elements, old from the standpoint of his claims or counts, into a patentable combination, unless the railroad is the mechanical equivalent of the standards or uprights, and the car wheels of the pivots carried thereby.

Defendants' seat is also distinguished from that of Rolph and Weyer by a different method of operation. One is compound, the other simple. A hand car may be shoved along the track by a mere push, but a switch standard can be moved only in the arc of a circle. The first is a simple motion; the second the compound result of applied force and pivoted connection. Just so with the two seats in question. The Deimel frame can be pulled out horizontally in the same plane, lifted straight up by taking it off the rails, raised through a circular arc, or raised and slid at the same time; but the Rolph frame, like the switch, admits of only one of these three motions. As said by the

Supreme Court in Cimiotti Unhairing Co. v. American Fur Refining Co., 198 U. S. 399, 25 Sup. Ct. 697, 49 L. Ed. 1100:

"If the device * * * shows a substantially different mode of operation, even though the result of the operation remains the same, infringement is avoided."

In the marketed form of defendants' fourth construction there is also a different result, as compared with the Rolph automatic design. It will be remembered that Rolph's last improvement was to so connect the parts as to avoid the necessity of pulling the sofa away from the wall. Only in part is this accomplished by defendants' form. If the tracks were long enough, the results would be the same; but defendants have so shortened them as to make it necessary to have the sofa at least eight inches from the wall in order that their device may operate.

It is urged, however, notwithstanding these differences, that the Rolph combination is so meritorious and successful as to be entitled to a range of equivalents broad enough to include the Deimal construction. It cannot be reasonably denied that Rolph made a distinct advance, in clearly discerning the important fundamental law of the sofa bed structure. While Breyer discovered it, he neither understood nor practically applied it. All he did was to turn a sofa seat upside down for a single bed, and at the same time get the sofa back out of the way. The real development of the sofa bed of to-day is due to Rolph's first invention; the two later forms being mere natural successive steps dependent on the original conception. Properly relying on these considerations, counsel insist that there is nothing in the Rolph reissue claim sued on which confines him to a stationary or nonshiftable pivot. Why not broaden out the uprights or standards and run the pivots in slots, which are only elongated bearings at the most? Counsel refer to the Wernicke bookcase pivot, which shifts the whole depth of the case, as clearly in point. Reliance is also placed on the language of the claims of the Rolph automatic patent which are in suit. On their face, and without reference to the drawings and description, it must be admitted that the claims are broad enough to include defendants' construction. When the claims refer to controlling and supporting *connections* to permit seat and back to be bodily moved to and from the wall with the sections maintained in their raised angle relation, the words are possibly general enough to cover shiftable connections. When they count on means adapted to move seat and back bodily outward, and turn or swing them in such movement, or means for pivotally mounting and suspending them to permit outward and inward movement bodily, and to be raised and swung or turned on the pivots, it is urged that this suggests a movable pivotal connection, as clearly as a stationary one. The claims are admirably drawn, with a view to exhaustively cover the whole invention; but even in the broadest ones the idea of nondetachable connection between the upper and lower parts is clearly apparent. So, also, the words "connections," "means adapted to move the parts," and "means for pivotally mounting," etc., clearly denote automatic or mechanical means.

When the description and drawings are consulted, all uncertainty and ambiguity in the wording of the claims disappear. Nowhere in the specifications or cuts is there a suggestion that a sliding pivot was contemplated, or anything but a rigid connection between seat and back portions and base. A patent, being a contract, "is within the cardinal rule that the manifest intention of the parties must govern its construction." Seaman, J., in Louden Machinery Co. v. Janesville Hay Tool Co., 148 Fed. 686, 78 C. C. A. 548. It seems clear that to construe the claims so as to cover defendants' fourth construction would violate this cardinal rule of construction.

If a new mode of operation had been produced by Rolph, a different structure performing the same functions might be an infringement, as in Winans v. Denmead, above cited. But in the absence of this, and with a different mode of operation in defendants' device, it does not infringe, even though the Rolph-Weyer claims should have a fairly liberal construction; even though Rolph be considered a "primary improver." He took the last and successful step, but his invention was an improvement only, a combination of old elements. Moreover, defendants leave out at least one element of that combination, and adopt a prior art suggestion.

The motion for rehearing is denied, and the bill dismissed, with costs.