### GRIER BROS. CO. v. BALDWIN et al.

#### (Circuit Court of Appeals, Third Circuit. January 22, 1915.)

#### No. 1891.

1. PATENTS ⬅141—VALIDITY OF REISSUE—BROADENING ORIGINAL CLAIMS.

    A reissue patent cannot be allowed to broaden the original patent after the lapse of so long a time as seven years, and after the original patent had been limited by final adjudication.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 206-213; Dec. Dig. ⬅141.]

2. PATENTS ⬅328—VALIDITY OF REISSUE—MINERS' LAMP.

    The Baldwin reissue patent, No. 13,542 (original No. 821,580), for a miners' acetylene lamp, claim 4, *held* void as broader than the original patent.

3. TRADE-MARKS AND TRADE-NAMES ⬅70—UNFAIR COMPETITION—MINERS' LAMP.

    A decree enjoining unfair competition by defendant in imitating complainant's miners' lamp, in form, appearance, and packages, considered and affirmed.

    [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. ⬅70.

    Imitation or simulation of trade-mark or trade-name as unfair competition, see note to John H. Rice & Co. v. Redlick Mfg. Co., 122 C. C. A. 447.]

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Suit in equity by Frederick E. Baldwin and the John Simmons Company against the Grier Bros. Company. Decree for complainants, and defendant appeals. Modified.

For opinion below, see 215 Fed. 735.

Joseph M. Nesbit and Thomas S. Brown, both of Pittsburgh, Pa., for appellant.

James Q. Rice, of New York City, for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

J. B. McPHERSON, Circuit Judge. The bill in this suit charges (1) infringement of reissued letters patent No. 13,542, and (2) unfair competition in the sale of the lamp covered thereby. It came first before the late Judge Young, who refused a preliminary injunction to restrain infringement, but granted it to restrain unfair competition. (D.

C.) 210 Fed. 560. Upon final hearing before Judge Orr, a final injunction was granted upon both grounds. (D. C.) 215 Fed. 735.

1. In order to understand the first branch of the controversy, the scope of the original letters patent must be determined. They are numbered 821,580 and were issued May 22, 1906, to Frederick E. Baldwin for improvements in acetylene gas lamps, "intended for use and adapted to use as bicycle, automobile, yacht, or miner's lamp, or for any other analogous purpose. * * *" The body of the lamp is a metallic or other container, and this is divided (horizontally by preference) into two chambers or compartments, the upper intended for water, and the lower for calcium carbid. The gas is generated in the lower chamber. The specification deals with two problems, but we are concerned with only one of them, namely, "The means for effecting and controlling the generation of gas." That problem arises out of the following situation: Finely divided carbid is placed in the gas-generating chamber and retained in position by a suitably adjusted spring or other suitable device. A tube leads from the water-chamber into the chamber below, and by this duct the water and the carbid are brought together. The gas is generated by the chemical reaction of these two substances, and the gradual feed of the water must be carefully maintained. The inventor goes on:

"Various means have been employed to regulate or control the normal rate of flow of water through a water-supply tube. For example, the bore of the tube has been made of small diameter; but this plan has not been found practical for various reasons. In the first place, the discharge outlet thereof is under pressure of several inches of water, and it is practically impossible to make the bore so minute that the water will issue in sufficiently small quantity. If the attempt is made to secure this small flow by making the tube very minute, it then becomes so easily clogged that the operation of the lamp is rendered extremely uncertain. The smallest particle of foreign matter in the water, or a bit of slaked carbid carried into the bore by back pressure of the gas, will stop the flow completely, and the lamp will go out. Such a tube is also difficult, in fact almost impossible, to clean. Another method which has been employed is to use a duct of comparatively large bore, and fill the same with a wick of more or less loose texture for the purpose of checking the supply. This for a time operates with some degree of success, though from the very nature of the material used the precise amount of the feed can never be exactly determined. A valve is generally necessary to regulate the supply. Furthermore, when the lamp has been used for a time, the wick, which, of course, must act as a strainer, becomes filled with solid matter—such as sand, dirt, and organic particles contained in the water—so that the feed is reduced. This necessitates frequent adjustment of the valve to restore the proper supply. In time the wick becomes completely choked, and the user, often unskillful in such matters, must tamper with the lamp and insert a new wick, which is at best a troublesome procedure. Again, if the lamp has not been used for some time, the wick dries out, and a very appreciable time is required to soak it up so that the water will again flow through."

These being the difficulties, the patentee turned to his means for overcoming them. His plan was to make the bore of the duct comparatively large, and then to obstruct or restrict it by placing a wire or rod therein, preferably in the center, thus leaving a channel of the proper size and shape. The advantages are thus described:

"This arrangement is simple; but in a long experience it has been found to be entirely successful. It is possible to secure the correct drop-by-drop

feed with a duct of considerable size, since the friction of the water on the large area of the tube-wall and wire reduces its flow. This retarding-friction may be regulated by varying the size of wire used. The duct does not become choked, since, if foreign particles are deposited therein, the water can take a zigzag course around (them) without the supply being appreciably affected. If it is at any time necessary to clean the tube, the wire is simply reciprocated and rotated a few times from the outside of the lamp without disturbing the position of other parts. This nice regulation of the flow enables me to entirely dispense with the troublesome adjustment of the valve. If a valve is used at all, it is employed to shut off the flow entirely and not to regulate it. The construction just described is shown," etc., etc.

As will be observed, the device thus described is intended to perform a certain part in effecting and controlling the generation of the gas; this part being the regulation of the water-supply, or the control of the flow. But the generation of the gas might also be effected and controlled in another way, and to this subject the inventor immediately passed on:

"In some cases, however, there is employed in connection with the means for introducing the water into the mass of carbid [that is, in connection with the duct and rod] a device in the nature of a stirrer, which, on proper manipulation, may be used to break up the mass of carbid surrounding the outlet of the water duct, and which, by having become slaked and caked by the action of water, prevents the proper percolation of the latter to the unslaked carbid in the receptacle $G$, Fig. 2. As such device I employ a stem or rod $N$, which extends down through the tube $L$ and is *bent at substantially right angles to form an arm N'*. This rod may form a prolongation of the valve-stem $M'$, of Fig. 2, or, in case no valve is used, may extend from the top of the lamp down through the water-reservoir, as shown in Fig. 3.

"As calcium carbid possesses strongly absorptive properties, the introduction of water through the tube $L$ will result in the gradual slaking of the material about its outlet: but the lime thus produced becomes gradually less permeable to the water, so that an insufficient quantity of gas is generated to maintain the proper flame. When this becomes noticeable, the rod $N$ is turned, so as to cause *the arm N'* to break up to a greater or less extent the mass of lime, and in practice I have found that under ordinary conditions this is amply sufficient to insure a substantially uniform generation of gas until all the carbid in the receptacle $G$ is exhausted.

"In the larger-sized lamps it is desirable to employ two or more water-tubes $L$ and, if desired, stirring-rods $N$, extending down to different points in the carbid-receptacle. This is indicated in Fig. 4, which is an under plan view of the bottom $D$ of the water-reservoir, showing three water-tubes $L$ in section. It is, however, desirable, when a plurality of stirring rods are employed, that some means be provided for actuating all of them simultaneously. A device suitable for this purpose is shown in Fig. 6, in which $O$ is a ring placed on top of the lamp, with which bent ends of all the rods $N$ engage, so that a partial rotation of the ring will impart a corresponding movement to each rod."

In the original patent, therefore, the inventor described two devices by which the generation of gas might be effected and controlled: (1) A tube with a wire or rod therein; and (2) a bent arm on the end of the wire or rod, which could be used as a stirrer. And he claimed both these devices in each of the first 4 claims:

"(1) In a lamp of the kind described, the combination with a water-reservoir, and a receptacle for calcium carbid, of a tube extending from the former a considerable distance into the latter so as to be embedded in the mass of carbid contained in said receptacle, and a rod or stem extending through said tube into the carbid-receptacle and having its end formed as a stirrer

to break up the slaked carbid around the outlet of the water-tube, as set forth.

"(2) In a lamp of the kind described, the combination with a water-reservoir, and a receptacle for calcium carbid, of a tube extending from the former into the latter so as to be embedded in the mass of carbid contained in the receptacle, a rod extending from a point outside of the lamp through the tube and into the carbid-chamber and having its end bent to form a stirrer for breaking up the slaked carbid around the outlet of the water-tube, as set forth.

"(3) In a lamp of the kind described, the combination with a water-reservoir, and a receptacle for calcium carbid, of a plurality of tubes extending from the former into the latter so as to be embedded in the mass of carbid contained in the receptacle, a stirrer passing through each tube adapted to break up the slaked carbid around the end of the tube, and means for actuating all the stirrers simultaneously, as set forth.

"(4) In a lamp of the kind described, the combination with a water-reservoir, and a receptacle for calcium carbid, of a water-tube extending from the former a considerable distance into the latter and adapted to be embedded in the mass of carbid in the receptacle, and a rod extending through the water-tube, and constituting a stirrer to break up slaked carbid around the outlet of the water tube, as set forth."

This, then, was the patent when it was originally issued in 1906. Three years later the patentee sued Jacob Bleser for infringing claims 1 and 4, as well as several claims of an earlier patent granted in 1900. The Bleser lamp closely resembled the Grier lamp now in question, particularly in the fact that it had no bent arm to act as a stirrer; the end of the rod within the duct being merely pointed. The Court of Appeals of the Seventh Circuit in Bleser v. Baldwin, 199 Fed. 133, 117 C. C. A. 615, decided that claims 1 and 4 of the patent now under consideration were not infringed by such a construction. The decision was rendered in April, 1912; and we can hardly doubt that the reissue was intended to meet the situation thus created, for it was applied for soon afterward—on February 5, 1913—although this was nearly seven years after the original grant. And the changes that mark the reissue are such as to indicate with much persuasiveness that this was in fact the intention. The patentee amended his specification in two respects: (1) He described the tube as always imbedded in the carbid—"extend the tube which forms the duct downward so that its end will be always embedded in the carbid"—a change of not much importance; and (2) he added this significant paragraph:

"It will be understood, from what has been said, that the function of the stirrer is to break up, pierce, or disturb the particles of the slaked carbid mass which, when the lamp is in use, forms at the delivery end of the tube. This slaked carbid mass tends to solidify and either shuts the water off altogether, or restricts it so that less water is delivered from the water-tube than the lamp demands for efficient operation. As it is sufficient, under certain circumstances, to insure the requisite water flow by so manipulating the stirrer, as to pierce, break up, or loosen the slaked carbid mass immediately around or at the mouth of the tube, it is obvious that the stirrer need not always be formed with a bent end, or so as to extend radially from the mouth of the tube."

Having thus described in his specification a kind of stirrer that would have covered Bleser's construction, he then amended claim 4 so as to read:

"In a lamp of the kind described, the combination with a water-reservoir, and a receptacle for calcium carbid, of a water-tube extending from the former a considerable distance into the latter and adapted to be embedded in the mass of carbid in the receptacle, and a rod extending through the water-tube, and constituting a stirrer to break up slaked carbid around the outlet of the water-tube; *the rod operating to restrict and thus control the flow of water to the carbid*, as set forth."

The italicized words being the clause inserted.

[1] Now, if we construe the reissue so as to eliminate the need for a bent arm—and this was its principal purpose—it operates to broaden the original patent, and (thus construed) claim 4 cannot be sustained. We have stated the facts fully in order to present the situation clearly, but we do not think it necessary to discuss the controlling legal principles. We think the authorities settle the proposition that a reissue cannot be allowed to broaden the original patent (as Baldwin attempted to do), especially after such a lapse of time as seven years, and after the claim had been limited by a final adjudication. And this would be true, even if no stress were to be laid upon the rights that had intervened by reason of the Bleser device, although Bleser himself had been manufacturing that device for several years, and the present appellant had been manufacturing it for several months, before the reissue was applied for. Powder Co. v. Powder Works, 98 U. S. 126, 25 L. Ed. 77; Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783; James v. Campbell, 104 U. S. 357, 26 L. Ed. 786; Coon v. Wilson, 113 U. S. 268, 5 Sup. Ct. 537, 28 L. Ed. 963; General Electric Co. v. Richmond Co., 178 Fed. 84, 102 C. C. A. 138; Railway Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053; Flower v. Detroit, 127 U. S. 563, 8 Sup. Ct. 1291, 32 L. Ed. 175; Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658.

[2] On the patent question, therefore, we think the decree should have been in favor of the defendant.

[3] 2. Turning now to the subject of unfair competition, we may note, in passing, that the requisite diversity of citizenship exists in this case, so that the question of jurisdiction that might otherwise arise at this point need not be discussed. Schiebel Toy Co. v. Clark, 217 Fed. 761, 774, 133 C. C. A. 490. We agree with the District Court that deliberate unfair competition has been proved, and the only question that calls for consideration is the extent of the relief that has been awarded.

The decree complained of enjoins the appellant from—

" * * * directly or indirectly placing upon the market, or causing to be placed on the market, the acetylene gas-generating lamp identified in this suit as 'Plaintiffs' Exhibit No. 6,' and which is complained of in this case as an imitation of Plaintiffs' Exhibit No. 1, or any other acetylene gas-generating lamp, which shall not be so differentiated or distinguished in outward form and appearance from plaintiffs' said lamp, identified as Plaintiffs' Exhibit No. 1, that purchasers thereof will not likely be deceived by similarity of form and appearance or by accessories sold therewith into purchasing such lamps, made or marketed by defendant, thinking the same to be plaintiffs' lamps, and also from doing any act or thing calculated to induce the belief that acetylene gas-generating lamps, not manufactured or offered for sale by plaintiffs, are, in fact, of plaintiffs' manufacture."

It is no doubt true that this decree is giving the appellant trouble, but this was its object; and we are only concerned with the inquiry whether it goes too far. In our opinion it does not, but is carefully guarded so as to protect the right of the Grier lamp to make a fair (but not an unfair) attack upon the market. We agree that actual imitations are not always unfair, but at present this lamp is undoubtedly a slavish imitation of the Baldwin device; and we are by no means satisfied that the numerous identities are essentially due to structural and economical necessities. It is of course true that the Baldwin lamp has no right to monopolize the trade, but the plaintiffs do have the right to insist that the Grier lamp shall cease from being merely a designed and colorable imitation, and shall stand on its own merits. We have no doubt the appellant's ingenuity is capable of solving that problem to the satisfaction of the court below, and we do not feel obliged to point out in what particulars the offending lamp should be modified. As at present constructed, it passes the limit of healthy rivalry in trade, and was properly enjoined. But the following observations may perhaps be usefully made:

The Baldwin lamp is undoubtedly a useful improvement, as its extensive use may indicate, but it has no right to dominate the situation. Its shape and design are protected, not by patent, but merely by the rules that govern unfair competition; and it seems clear enough that the necessities of the art require that in size and arrangement all such lamps must bear a general resemblance among themselves. The container must be small, and must be divided internally into a water-chamber and a chamber for the carbid, and this necessity must influence the shape and arrangement to a considerable degree. Moreover, the lamp must be light in weight, especially when it is to be used in a mine, where it is ordinarily attached to a miner's cap. The patented features are concealed, and cannot be seen by ordinary inspection, so that unlawful interference therewith may be difficult to prevent; but it is not these features with which we are now concerned. The superficial details of construction certainly need not be identical in nearly every particular, as they are in Exhibit No. 6; and of course it is also unfair to represent the Grier lamp as a Baldwin, or as an improved Baldwin, lamp, or to accompany it with nearly identical instructions printed in the same foreign languages, and with the peculiarly-shaped cleaner referred to by the court below. All these matters were plainly intended to aid in confusing purchasers, and are abuses of the right to compete. It was also objectionable to stamp the appellant's name on a similar part of the lamp in raised characters that bear the same general form and appearance. There was no compelling reason for this, and we can hardly doubt its purpose, namely, to aid in misleading miners unacquainted with English. On the other hand, the cartons inclosing the lamps differ in appearance, and the Grier lamp has a self-sparker attached to the rim of the reflector; this too being a valuable aid in distinguishing the lamps. We have not exhaustively described the details of likeness and difference; our main purpose has been to avoid giving the impression that we regard the Baldwin lamp as having the right to exclude all

competitors, while protecting that lamp in the trade that has been acquired by legitimate means. We therefore repeat that the precise matter before us is the correctness of the decree, and for the reasons thus outlined, we think it was right. If the appellant desires a ruling from the court below upon a proposed change in the details and appearance of Exhibit No. 6, we have no doubt that a proper application for such a purpose will be entertained and passed upon in a fair and reasonable spirit.

So much of the decree below as refers to the subject of unfair competition is affirmed, but the rest of the decree must be modified in accordance with this opinion; the costs in the District Court and in this court to be equally divided.