BALDWIN (JOHN SIMMONS CO., Intervener) v. ABERCROMBIE & FITCH CO. (JUSTRITE MFG. CO., Intervener).

(Circuit Court of Appeals, Second Circuit. November 9, 1915.)

No. 26.

1. PATENTS ☞327—SUITS FOR INFRINGEMENT—FOLLOWING DECISIONS IN OTHER CIRCUITS.

A Circuit Court of Appeals, in doubtful cases involving the validity of patents, will conform to a decision in another circuit; but where it is convinced that the conclusion reached was wrong, it is not at liberty to surrender its own judgment for the purpose of securing uniformity of decision.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 620–625; Dec. Dig. ☞327.]

2. PATENTS ☞328—VALIDITY OF REISSUE—INFRINGEMENT—MINER'S ACETY-LENE GAS LAMP.

The Baldwin reissue patent, No. 13,542 (original No. 821,580), for an acetylene gas generating lamp, principally for miner's use, claim 4, was not anticipated and is not invalid, as broadening the same claim in the original patent, but discloses patentable invention and is valid; also held infringed.

3. PATENTS ☞324—SUIT FOR INFRINGEMENT—RECORD ON APPEAL—PRINTING EXHIBITS.

To render effective a stipulation in an infringement suit that prior art patents introduced in evidence need not be printed in the record on appeal, but that the original exhibits may be used, the approval of the Circuit Court of Appeals is necessary.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 600–606; Dec. Dig. ☞324.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Frederick E. Baldwin, in which the John Simmons Company intervenes, against the Abercrombie & Fitch Company, in which the Justrite Manufacturing Company intervened. Decree for complainants, and defendants appeal. Affirmed.

For opinion below, see 227 Fed. 455.

This cause comes here on appeal from the decree of the United States District Court for the Southern District of New York, entered on February 10, 1915, holding valid and infringed claim 4 of the reissue patent No. 13,542, issued to Frederick E. Baldwin on March 11, 1913. The invention covered by this patent is for a lamp designed to generate and burn acetylene or similar gas. It is intended for use as a bicycle, automobile, yacht, or miner's lamp,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

but its commercial utility has been principally in connection with miner's cap lamps. The invention is shown in the following drawing:

The specification describes the lamp as follows: "Generally considered, the lamp is one comprising a metallic or other receptacle *A*, preferably provided with a bottom *B*, which may be readily detached and which when the lamp is in use is held firmly in position by suitable clamps *C*, so as to make a water and gas tight closure. The receptacle is divided, preferably horizontally, by a partition *D* into two compartments, the upper one, *E*, designed to serve as a water chamber or reservoir, the lower, *F*, as a gas-generating chamber adapted to contain a receptacle *G* for calcium carbid, which is generally attached to or forms the detachable bottom. In the top of the lamp is an orifice closed by a screw cap *H* or similar device for the introduction of water to the reservoir, and from the gas-generating chamber *F* through the water reservoir *E* and out through the top of the lamp extends a tube *I*, which conducts the gas to the burner *J*."

The complainants relied solely upon claim four, which reads as follows: "In a lamp of the kind described, the combination with a water reservoir, and a receptacle for calcium carbid, of a water tube extending from the former a considerable distance into the latter and adapted to be embedded in the mass of carbid in the receptacle, and a rod extending through the water tube, and constituting a stirrer to break up slaked carbid around the outlet of the water tube, the rod operating to restrict and thus control the flow of water to the carbid, as set forth."

The John Simmons Company intervened in the suit, became a complainant, and alleged that it was a corporation organized and existing under the laws of the state of New York; that it had its principal place of business in the borough of Manhattan in said state; that it was the only manufacturer of the inventions of the plaintiff, Baldwin, and that unless it was allowed to intervene it would necessitate the beginning of a new action for the recovery of damages and profits; that in 1908 an arrangement was made between it and Baldwin whereby the former manufactured the lamps while both parties sold them; that in 1911 a new contract was made, under which it acquired the exclusive right to manufacture and sell the lamps.

The Abercrombie & Fitch Company, of the borough of Manhattan and state of New York, was the original defendant and sold the lamps alleged to infringe. The Justrite Manufacturing Company of Chicago, Ill., was the manufacturer of the lamps sold by the Abercrombie & Fitch Company, and intervened under federal equity rule No. 37, which provides that any person may be made defendant who has or claims an interest adverse to the plaintiff.

The amended answer of the Justrite Manufacturing Company denied that the plaintiff, Baldwin, was the original, sole, and first inventor of the alleged improvement claimed by him in his letters patent; averred that the said improvement was null and void for want of utility, as well as for want of invention on the part of Baldwin; denied that the same had been in public use or on sale for more than two years prior to the application for the patent; denied the fact of infringement; averred that the principle of the alleged invention was not new, but had been fully described in letters patent, both of the United States and of foreign countries, long prior to the applica-

tion made by the plaintiff, Baldwin, for his patent, and averred that the reissue patent No. 13,542 was invalid.

The testimony was taken in open court, and a decree entered holding reissue letters patent No. 13,542 to be valid as to claim 4, that defendants had infringed, that plaintiff recover the profits which defendants derived from their infringement, that a perpetual injunction issue, and that the injunction granted be suspended pending appeal if appeal be promptly taken. It was also decreed that plaintiffs recover their costs and disbursements.

James R. Offield and Charles K. Offield, both of Chicago, Ill., for appellants.

James Q. Rice, of New York City, for appellees.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). United States patent No. 656,874 was issued to Frederick E. Baldwin on August 28, 1900, for an acetylene gas generating lamp; and letters patent No. 821,580 was issued to him on May 22, 1906, for an improvement on the form described in No. 656,874; and reissued letters patent No. 13,542 was issued to him on March 11, 1913, and is the patent in suit.

Patents No. 656,874 and No. 821,580 came before the Circuit Court for the Southern District of Illinois in a suit brought by Baldwin, who claimed his patents were infringed by the lamp of the Bleser patent, No. 949,349. The court sustained Baldwin's claims, and the case was appealed to the Circuit Court of Appeals for the Seventh Circuit, which affirmed in part and reversed in part. The court, decided that patent No. 656,874 was valid, and claim 1 infringed by the Bleser patent, but held claims 2, 3, 4, 5, 6, and 10 not infringed. Patent No. 821,580 was held valid, but not infringed. It declared that in view of the prior art patent No. 656,874 was not entitled to a broad construction with reference to equivalents. Bleser v. Baldwin, 199 Fed. 133, 117 C. C. A. 615 (1912).

The above decision was handed down on April 23, 1912, and Baldwin on February 3, 1913, filed his application for the reissued patent No. 13,342. The latter patent then came before the District Court for the Western District of Pennsylvania, and was held valid and infringed. Baldwin v. Grier Bros., 215 Fed. 735. The case was then taken on appeal to the Circuit Court of Appeals for the Third Circuit, and that court held claim 4 of the reissued patent void. The court thought claim 4 of the reissue patent broader than that of the original patent, and said that a reissue patent could not be allowed to broaden an original patent after the lapse of so long a time as seven years, and after the original patent had been limited by final adjudication. Grier Bros. Co. v. Baldwin, 219 Fed. 735, 135 C. C. A. 433.

In the suit now before us this same claim 4 of the reissue patent is the claim involved. The court below has held it valid and infringed. Its opinion conflicts with the decision in the Third Circuit.

[1] This court appreciates that uniformity is desirable in decisions respecting the validity of patents, and is disposed in all doubtful cases to conform to a decision rendered in another circuit. But in a case in which this court is convinced that the conclusion reached was wrong,

it is not at liberty to surrender its own judgment upon the issue involved in order that uniformity may be secured. In Mast, Foos & Co. v. Stover Manufacturing Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856 (1900), Mr. Justice Brown said:

"Comity persuades; but it does not command. It declares, not how a case shall be decided, but how it may with propriety be decided. It recognizes the fact that the primary duty of every court is to dispose of cases according to law and the facts; in a word, to decide them right. In doing so, the judge is bound to determine them according to his own convictions. If he be clear in those convictions, he should follow them. It is only in cases, where, in his own mind, there may be a doubt as to the soundness of his views, that comity comes in play and suggests a uniformity of ruling to avoid confusion, until a higher court has settled the law. It demands of no one that he shall abdicate his individual judgment, but only that deference shall be paid to the judgments of other co-ordinate tribunals. Clearly it applies only to questions which have been actually decided, and which arose under the same facts."

The plaintiff, Baldwin, first began to market an acetylene miner's cap lamp in January, 1906. At that time there was no other acetylene cap lamp on the market. Prior to the introduction of the Baldwin lamp, miners used oil lamps, with a wick, or candles. In an oil lamp the mining law required the use of a high grade of oil, which cost the miners from 28 to 40 cents a gallon, and a gallon lasted for a week. The Baldwin acetylene lamp resulted in quite a saving to the miners, for it could be used for a week at a cost not to exceed 8 cents. The oil lamps, too, gave off a great deal of smoke, which contributed largely to miner's asthma and also consumed a great deal of the oxygen of the air. The Baldwin lamp gave off no smoke, and only consumed one-eighth of the oxygen that the oil lamps consumed. Then, too, the oil lamps had a very large wick, an inch in diameter and rough on the top, and in going through windy places with them sparks were often blown off into the timber, which was oil-soaked, and therefore dangerous. And miners were sometimes careless, and would throw partly consumed wicks away without putting their foot on them to extinguish them. In preparing powder to blast with, the miners often would keep the lamps on their hats, although the law prohibited their doing so, and sometimes a spark would fall on the powder and ignite it. It was not an uncommon occurrence for miners to be injured in this way. So that the invention of the plaintiffs' acetylene lamp involved a considerable saving of money to the miners, as well as an improvement in their health through better air, and gave them protection against explosions and the dangers arising from conflagrations within the mines. It is not surprising, therefore, to find that over 1,000,000 of the acetylene lamps of the patent have been sold in the market in the short time that has elapsed since the patent was granted. The Baldwin lamp had merit in it, and the inventor accomplished something that was well worth while.

[2] We come now to consider the questions involved. The Circuit Court of Appeals in the Seventh Circuit held, as before stated, that the original patent was valid, including claim 4, and the Third Circuit held that claim 4 was invalidated by the fact that in the reissue it had been broadened. The patentee had amended his specifica-

tion in two particulars: (1) He described the tube as always embedded in the carbid. (2) He added the following statement:

"It will be understood from what has been said that the function of the stirrer is to break up, pierce, or disturb the particles of the slaked carbid mass, which, when the lamp is in use, forms at the delivery end of the tube. This slaked carbid mass tends to solidify, and either shuts the water off altogether or restricts it so that less water is delivered from the water tube than the lamp demands for efficient operation. As it is sufficient, under certain circumstances, to insure the requisite flow of water by so manipulating the stirrer as to pierce, break up, or loosen the slaked carbid mass immediately around or at the mouth of the tube, it is obvious that the stirrer need not always be formed with a bent end, or so as to extend radially from the mouth of the tube."

He then amended claim 4 so as to read:

"In a lamp of the kind described, the combination with a water reservoir, and a receptacle for calcium carbid, of a water tube extending from the former a considerable distance into the latter and adapted to be embedded in the mass of carbid in the receptacle, and a rod extending through the water tube, and constituting a stirrer to break up slaked carbid around the outlet of the water tube, *the rod operating to restrict and thus control the flow of water to the carbid, as set forth*" (the italicized words being the clause inserted).

It will be at once conceded that amendment 1 is not of importance. The objection to amendment 2, as the Third Circuit thought, was that it eliminated the need of a bent arm at the end of the rod used as a stirrer. The Seventh Circuit had held that a rod without a bent arm did not infringe claim 4, and if that decision was right the Third Circuit was right in regarding the amendment made in the reissue patent as broadening the patent and therefore void. But we are unable to concur in the view taken of the matter in the Seventh Circuit, and, not concurring in that view, we are unable to concur in the view taken in the Third Circuit.

The decision in the Seventh Circuit confined the patentee to a substantially right-angled stirrer, while the original claim merely said "constituting a stirrer." The material thing was to stir the sludge, and one can stir such a substance as carbid sludge by an up and down motion of a straight rod, though perhaps not as thoroughly as he can by the rotary motion of a bent part. Claim 1 covers "end formed as a stirrer," which might properly call for something more than a straight end. Claim 2 covers "end bent to form a stirrer." Claim 4 has no limitation, but speaks merely of the rod as "constituting a stirrer," which, especially in view of the phrasing of the other two claims, may properly be construed as covering a rod, of whatever shape (straight or bent), which penetrated into the carbid sufficiently to allow of its being used to stir the same. In that respect it differed from the prior art. It seems to us that the court in the Third Circuit erred in not holding that the "rod extending through the water tube * * * as set forth" was the sort of rod to which the patentee had devoted a whole column of description dealing with prior art, defects, and his improvement to avoid them; that is to say, a rod of thickness sufficient to regulate flow of water through the tube. It does not follow that, because the original patent shows a stirrer having a bent

end, it is limited to such a stirrer, notwithstanding that the patent defines the function the stirrer is to discharge, and notwithstanding that, in the lamps in suit, a stirrer having a straight end discharges precisely that function.

The Supreme Court laid down the rule in Machine Company v. Murphy, 97 U. S. 120, 125, 24 L. Ed. 935 (1877), as follows:

"Except where form is of the essence of the invention, it has but little weight in the decision of such an issue; the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions, or in a different way, or produce a substantially different result. Nor is it safe to give much heed to the fact that the corresponding device in two machines organized to accomplish the same result is different in shape or form the one from the other, as it is necessary in every such investigation to look at the mode of operation or the way the device works, and at the result, as well as at the means by which the result is attained. * * * Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself, so that, if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape. Curtis, Patents (4th Ed.) § 310."

And see Winans v. Denmead, 15 How. 330, 14 L. Ed. 717 (1853). The straight rod idea was an alternative form, which the patentee was entitled to use instead of a rod with a bent form. Baldwin filed his original application in July, 1903, and the patent was not granted until May, 1906, and between the time of the application and the time of the grant Baldwin had made lamps in which he had used both a straight rod and the rod with the bent arm. So that it is incorrect to say that the straight rod was suggested to him by the litigation in Baldwin v. Bleser.

As a stirrer having a straight end accomplishes in a miner's cap lamp the exact function which one accomplishes with a bent end, the reissue did not, in the opinion of this court, broaden the patent, and a rod with a straight end infringes the patent in suit, assuming the patent to be valid. And that the patent now before the court is valid we have no doubt.

In discussing the prior art appellants in their brief refer to the Mosher patent, No. 644,439, and they assert that the broad principle of restricting the control of the flow of the water by a restricting rod in the water tube is clearly shown in that patent. The appellees in their brief refer to the same patent, and claim that it is clear that it has no restricting rod, such as that of the patent in suit. They say that the Mosher patent has no water tube imbedded in the carbid, and has nothing which has the function of, or which corresponds to, the stirrer of the complainant's device. The experts on each side refer to the patent and undertake to quote from it. We find, however, no such patent in the record and the experience of this court inclines us

to give little weight to the statement of a witness as to what a patent states, when we are not furnished with the patent, so that we can see for ourselves exactly what it does and does not disclose.

[3] Examination of the record shows that, subsequent to the time when allowance of appeal had brought the cause into this court, counsel entered into a stipulation that the prior art patents need not be printed in the record, but might be taken to this court as physical exhibits. To this stipulation they obtained the indorsement by a District Judge of the words, "So ordered." Attention of the bar is called to the fact that this court is the one to determine whether or not exhibits marked in evidence in the trial court and sent up here shall or shall not be printed in the record upon which argument is to be had and decision to be asked for. The court is composed of three judges, who necessarily have to study the records on appeal, not in banc, but individually; they cannot do so properly and expeditiously, if there are only single copies of patents, which counsel think of sufficient importance to refer to in their briefs. It is most embarrassing, when one is considering an argument based on such reference, to have to suspend such consideration until he can, perhaps on some subsequent day, obtain the patent from one or the other of his associates. Hereafter the clerk of this court, whenever a stipulation such as this is found in any record filed here, will at once notify counsel that an approval by this court is necessary to its validity.

We may say, however, that we do not find in the Mosher patent, assuming the quotations to be accurately given by the experts, anything which negatives Baldwin's invention.

The appellants strongly rely on the Schmitt British patent, No. 15,-688, dated July 18, 1898. They assert that in it is to be found the most complete anticipation of the patent in suit, and they see in it a complete and accurate embodiment of all that is called for in claim 4 of the reissue patent. It is true that in the Schmitt patent there is a water reservoir and a water tube. But there is no disclosure of the tube being imbedded in the carbid, nor is there a disclosure of a restricting rod or a stirrer such as is disclosed in the patent in suit. It is true there is a rod extending through the water tube, and that it is movable vertically within the tube. But it is described as a cleaning rod, and that clearly was its sole purpose, notwithstanding the fact that the expert of the appellants argued that it was a restricting rod. The expert on the other side squarely denied that this rod had any such functions, and we coincide in that opinion. The water feed in the Schmitt patent is not controlled by the rod, but is controlled in part by the valve and in part by the use of a wick in the tube, a device which is referred to in Baldwin's patent as prior art which had proved unsatisfactory.

It is sought to help out the Schmitt patent by an article taken from Dingler's Polytechniches Journal. But surely, if the disclosure of the Schmitt patent is insufficient, as we have found it is, it cannot be helped out by the publication referred to. It does not, however, aid appellants' case. The sieve tube, which it shows, makes it clear that in the lamp which it discloses the end of the water tube is not imbedded in

the carbid. In describing the filling of the lamp, the article states that "care should be taken during the filling operation not to let any carbid fall in to the center straining tube." We think this sieve tube makes it clear that in the lamp of the Dingler publication the end of the water tube is not imbedded in the carbid, and, not being so imbedded, it could not have been intended that it should be a stirrer. The language of the Dingler Journal is:

"For the regulating the water feed and to avert the clogging up of the water drop hole, a wire o is inserted in the tubular end of the water drop valve."

Reference to the drawing shows that the clogging was not from carbid, because the tube and wire all go into the center sieve tube, which is carefully kept free of carbid. There was nothing, therefore, to be stirred. The words "to regulate the water feed" are too vague to give any definite idea of how this is done; there is nothing to indicate that it is accomplished in the manner adopted in the patent in suit. Baldwin clearly sets forth the difficulties which he found in the lamps of the prior art, and he describes the manner in which he proposes to attain the end desired. He says:

"Various means have been employed to regulate or control the normal rate of flow of water through a water supply tube. For example, the bore of the tube has been made of small diameter; but this plan has not been found practical for various reasons. In the first place, the discharge outlet thereof is under pressure of several inches of water, and it is practically impossible to make the bore so minute that the water will issue in sufficiently small quantity. If the attempt is made to secure this small flow by making the tube very minute, it then becomes so easily clogged that the operation of the lamp is rendered extremely uncertain. The smallest particle of foreign matter in the water, or a bit of slaked carbid carried into the bore by back pressure of the gas, will stop the flow completely, and the lamp will go out. Such a tube is difficult—in fact, almost impossible—to clean. Another method which has been employed is to use a duct of comparatively larger bore, and fill the same with a wick of more or less loose texture, for the purpose of checking the supply. This for a time operates with some degree of success, though from the very nature of the material used the precise amount of the feed can never be exactly determined. A valve is generally necessary to regulate the supply. Furthermore, when the lamp has been used for a time, the wick, which, of course, must act as a strainer, becomes filled with solid matter—such as sand, dirt, and organic particles contained in the water—so that the feed is reduced. This necessitates frequent adjustment of the valve to restore the proper supply. In time the wick becomes completely choked, and the user, often unskillful in such matters, must tamper with the lamp and insert a new wick, which is at best a troublesome procedure. Again, if the lamp has not been used for some time, the wick dries out, and a very appreciable time is required to soak it up, so that the water will again flow through.

"The method which I have invented for securing the proper feed under all circumstances, without the above objectionable features, is to make the bore of the duct of comparatively large size, extend the tube which forms the duct downward, so that it is and will be always imbedded in the carbid, and then restrict the duct by means of a wire or rod, preferably centrally located therein, to leave a channel of the proper size. This arrangement is simple; but in a long experience it has been found to be entirely successful. It is possible to secure the drop-by-drop feed with a duct of considerable size, since the friction of the water on a large area of the tube wall and wire reduces its flow. This retarding friction may be regulated by varying the size of wire used. The duct does not become choked, since, if foreign particles are deposited therein, the water can take a zigzag course around it, without the supply being

appreciably affected. If it is at any time necessary to clean the tube, the wire is simply reciprocated and rotated a few times from the outside of the lamp, without disturbing the position of other parts. This nice regulation of the flow enables me to entirely dispense with the troublesome adjustment of the valve. If a valve is used at all, it is employed to shut off the flow entirely, and not to regulate it."

The appellants also rely on the Handshy patent, No. 591,132. In that patent it is claimed that the rod which extends through the water tube was intended to control the flow of water. There is nothing, however, in the specification, that indicates that the rod had any such function, and counsel cannot seriously claim that the rod in question restricted to any useful degree the flow of the water. The experts on both sides practically agreed that the rod in the Handshy patent was without effect in restricting and controlling the water flow, because it was too small. It is equally evident that the rod could not operate as a stirrer. The water tube could not be imbedded in the carbid, for the reason that, if it were, as the carbid slaked and the sludge formed, the expanding sludge would prevent the reciprocating movement of the tube on which the operation of the lamp depended.

The appellants rely chiefly upon the invalidity of the patent. It is true, however, that they assert that there is no infringement. They say there can be no infringement, for the reason that the lamp made by the Justrite Company has no stirrer within the meaning of the original patent. But, as we have shown, the language of the original patent was comprehensive enough to include the stirrer of the original patent. And defendants do not avoid infringement because their lamp contains a shut-off valve, which may be used to open or close the mouth of the water tube. It is not questioned that the flow of water through the water tube can be increased or diminished by turning this valve, but obviously that is not the purpose of the valve. It is clear that this valve was intended to be used simply as a shut-off valve, and not as a regulating valve. That being so, infringement is plain, for the lamp of the defendants is identical with the lamp of the plaintiffs. The lamp of defendants has the carbid container, the restricting and controlling rod, and the stirrer. The rod and tube of the lamp of the plaintiffs as embodied in the lamp of the defendants afford all the regulation of the flow of the water that is necessary.

The conclusions which we have reached are:

That the patent in suit is not invalid because of anything in the prior art.

That claim 4 of the original patent is valid, and was not broadened in the reissue patent.

That claim 4 of the reissue patent, being valid, is infringed by the defendants.

That no error was committed by the court below.

The decree is in all respects affirmed, with costs.