EISENSTADT MFG. CO. v. J. M. FISHER CO.

(District Court, D. Rhode Island.   May 18, 1916.)

No. 54.

**1. TRADE-MARKS AND TRADE-NAMES ☞75—UNFAIR COMPETITION.**

A jeweler designed a friendship bracelet, consisting of numerous small links, which could be interchanged by friends, and until the bracelet was completed and united by metal wires should be worn on a velvet band. The company which originally manufactured the bracelets ceased manufacturing when the designer assigned to complainant the right to make and sell such bracelet. The completed bracelet was patented, but the links were not. Thereafter defendant began to make and sell similar links for bracelets. There was nothing in the nature of the links manufactured by the original manufacturer or by complainant to indicate the origin of the goods, nor did defendant's links purport to be made by the original manufacturer or complainant. *Held* that, as defendant advertised itself as the manufacturer of its own product, and as the separate links were not patented and the patent was not relied on, there was no actionable deceit of customers which would warrant the enjoining of defendant's continued manufacture.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 86; Dec. Dig. ☞75.]

**2. TRADE-MARKS AND TRADE-NAMES ☞78—UNFAIR COMPETITION—ADVERTISING.**

In such case, where complainant and defendant were competitors before complainant began its advertising campaign, the fact that defendant might have reaped benefit from the advertising does not warrant an injunction.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 88; Dec. Dig. ☞78.]

**3. TRADE-MARKS AND TRADE-NAMES ☞32—UNFAIR COMPETITION—DEDICATION OF PRODUCT TO PUBLIC.**

As the designer and original manufacturer, after describing the bracelet generally in trade journals abandoned manufacture, the public had the right to manufacture the article, and complainant could acquire no exclusive right, so as to prevent others from making bracelets.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 36; Dec. Dig. ☞32.]

**4. TRADE-MARKS AND TRADE-NAMES ☞75—UNFAIR COMPETITION—WHAT CONSTITUTES.**

In such case the fact that links sold by defendant were at times connected with wires furnished by complainant to jewelers does not warrant an injunction, in view of the fact that defendant also furnished similar wires to connect the friendship links.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 86; Dec. Dig. ☞75.]

In Equity.   Bill by the Eisenstadt Manufacturing Company against the J. M. Fisher Company.   Bill dismissed.

E. E. Huffman, of St. Louis, Mo., and Wilmarth H. Thurston, of Providence, R. I., for complainant.

Frederick S. Hall and Stanley P. Hall, both of Taunton, Mass., Walter A. Briggs, of Attleboro, Mass., and George A. Rockwell, of Boston, Mass., for defendant.

BROWN, District Judge.   The bill charges and seeks to enjoin unfair competition in making and selling an article which closely resembles an article made and sold by the plaintiff.

The Eisenstadt Manufacturing Company makes and sells "bracelet links," which, by structure and design, are adapted to be assembled to complete what is termed a "friendship bracelet." They have advertised these links under the name of "Bob-o-link." One of their advertisements thus describes the scheme of sale:

### Here's the Way It Works.

A girl starts a bracelet by exchanging "Bob-o-links" with a friend. They each wear their "Bob-o-link" with the friend's initials engraved upon it, on a narrow black velvet ribbon around the wrist. Then they start other friends by exchanging "Bob-o-links" with them. Thus they complete their own bracelet, and in doing so start ten or a dozen other girls, who in turn start another ten or a dozen, and so it goes until everybody has a "Bob-o-link" bracelet. It takes from nine to twelve "Bob-o-links" to complete a bracelet, and a girl isn't satisfied until she has one completed—then she immediately starts another. There is no end to it.

When a girl has enough "Bob-o-links" she goes to her jeweler and has them clamped together with the small silver links, which are provided for that purpose."

The plaintiff originated neither the special design of link which it seeks to enjoin the defendant from making, nor the scheme of sale.

In January, 1915, H. B. Pratt conceived the idea of making what he termed a "friendship bracelet."

As the amended bill alleges, for about three months prior to April 1, 1915, H. B. Pratt and Bullard Bros. Company had been continuously manufacturing the said links and selling them in various localities throughout the United States, and had created a substantial demand for said links, and all the business in said links was carried on in the name of Bullard Bros. Company. Newspaper articles explaining Pratt's bracelet link idea were published in various jewelry trade magazines and Bullard Bros. had disposed of about 25,000 of these links in many different states.

The article, already on the market, having been brought to the attention of officers of the plaintiff company by a traveling salesman some time in March, 1915, it made a proposal to Pratt by letter of April 1, 1915, for a contract to be in force for two years, with privilege of renewal for another year, "for the exclusive right to make and sell your 'friendship, interlocking link bracelet,' in silver, gold or other metals." The plaintiff agreed to pay royalties on sales. The following language was also used:

"This exclusive right granted is to cover the patents now pending, and all improvements or subsequent patents which may be applied for and obtained on this bracelet, or any article of similar character."

This proposal was accepted by Pratt April 1, 1915, with a modification relating to an existing contract with a third person. The parties to the contract were Pratt and the plaintiff company, and the written contract apparently relates to rights in an invention or inventions of Pratt for which applications for patents were pending, or were contemplated. There is evidence, however, that after the making of this contract Bullard Bros. Company discontinued the manufacture and sale of the article, and that they received a share of royalties paid by plaintiff to Pratt.

A patent, No. 1,166,629, was issued January 4, 1916, on Pratt's ap-

plication of March 3, 1915, for a bracelet; but this patent, which claims only a complete bracelet and not the individual links is not relied upon in the present case, except to show good faith of the plaintiff in issuing certain notices in which patent rights were asserted, and to meet the defense that because of misrepresentations to the public in respect to patent rights the complainant does not come into equity with clean hands.

No evidence is produced to show that Bullard Bros. Company ever made any formal agreement with the plaintiff to discontinue the manufacture of the article, or assigned to it any supposed good will. Though plaintiff now claims to have succeeded to the business and good will of Bullard Bros. Company, there is no evidence of any contract between Bullard Bros. Company and the plaintiff to this effect, and the plaintiff advertised itself as "makers and distributors under license of H. B. Pratt, inventor." There is no evidence that it attempted to use any of the reputation of Pratt or Bullard Bros. Company as manufacturers.

The evidence shows that the article of the special design for which plaintiff seeks protection was not exclusively associated in the public mind with the Eisenstadt Manufacturing Company as manufacturers, but, on the contrary, was also associated with Bullard Bros. Company as manufacturers.

By stipulation in this case it appears also that the complainant issued a circular dated May 28, 1915, in the name of and by authority of H. B. Pratt, giving notice to the trade that applications for design and apparatus patents were pending, and warning against infringement. This circular contained the following statement:

"The Eisenstadt Manufacturing Company, of St. Louis, Missouri, the Standard Button Company, of Attleboro, Mass., and Bates & Bacon, of Attleboro, Mass., are the only authorized manufacturers and distributors of the genuine 'Bob-o-link' bracelet."

[1] In this case it is quite necessary to make what Mr. Wigmore refers to as "the distinction between actionable deception of the customer by imitation of the authorship, and nonactionable imitation of the merchandise without deception as to authorship." See Harvard Law Rev., April, 1916, p. 609; Flagg Mfg. Co. v. Holway, 178 Mass. 83, 59 N. E. 667.

It is true that in some cases the appearance of an article may indicate authorship, so that the offering of a copy in itself tends to deceive as to authorship.

There is some conflict between the exercise of the right to copy an unpatented design or manufacture and the right of a prior manufacturer to prevent a competitor from copying, where such copying in itself results in deception of the public as to the origin of the goods. When the article has become associated in the mind of the public with the manufacturer who first put the article on the market, and when the reputation of that manufacturer and of the quality of his goods is a matter of substantial importance to the public as well as to the manufacturer, the right to copy may be subject to the obligation to give such notice as may be necessary in the particular circumstances, in

order to prevent such mistake or deception of the public as might arise ,from putting a copy on the market.

The defendant relies upon Keystone Type Foundry v. Portland Pub. Co., 186 Fed. 690, 108 C. C. A. 508, which involved the question whether there was unfair competition in copying the design of a certain type, or type face, originated by the plaintiff and advertised as "Caslon Bold." In that case the court said:

> "The defendant has not sought to avail itself of the complainant's reputation as a founder, but of its taste and skill as a designer. This it may do. It may copy the complainant's type, so long as it does not pretend that the copy is an original product of the complainant"

—and quotes with approval Flagg Mfg. Co. v. Holway, 178 Mass. 83, 59 N. E. 667. The defendant also cites Rathbone, Sard & Co. v. Champion Steel Range Co., 189 Fed. 26, 110 C. C. A. 596, 37 L. R. A. (N. S.) 258; Rice & Co. v. Redlich Mfg. Co., 202 Fed. 155, 122 C. C. A. 442, 44 L. R. A. (N. S.) 1057; Armstrong Seatag Corp. v. Smith's Island Oyster Co., 224 Fed. 100, 139 C. C. A. 656; Diamond Match Co. v. Saginaw Match Co., 142 Fed. 727, 74 C. C. A. 59; Pope A. M. Co. v. McCrum-Howell Co., 191 Fed. 979, 112 C. C. A. 391, 40 L. R. A. (N. S.) 463.

The complainant cites a number of cases in which the court apparently has been of the opinion that the copying, in view of the association of the article copied with a particular manufacturer, was a means of palming off goods as those of another, and of trading upon another's reputation. Steiff v. Bing (D. C.) 215 Fed. 204; Strause v. Weil et al. (C. C.) 191 Fed. 527; Enterprise Mfg. Co. v. Landers, Frary & Clarke, 131 Fed. 240, 65 C. C. A. 587; Yale & Towne Mfg. Co. v. Alder, 154 Fed. 37, 83 C. C. A. 149; E. B. Estes & Sons v. George Frost Co., 176 Fed. 338, 100 C. C. A. 258; Stewart v. Hudson (D. C.) 222 Fed. 584; U. S. Expansion Bolt Co. v. Kroncke Hdw. Co. (D. C.) 225 Fed. 383; Rushmore v. Manhattan S. & S. Works, 163 Fed. 939, 90 C. C. A. 299, 19 L. R. A. (N. S.) 269; Rushmore v. Saxon (C. C.) 158 Fed. 499; Baldwin v. Grier Bros. Co. (D. C.) 215 Fed. 735; Grier Bros. Co. v. Baldwin, 219 Fed. 735, 135 C. C. A. 433; Moxie Co. v. Daoust, 206 Fed. 434, 124 C. C. A. 316.

The complainant contends that the zither case, Flagg v. Holway, 178 Mass. 83, 59 N. E. 667, in so far as it supports the view that a second comer in the field may imitate unessential features of goods on the market to an extent likely to cause confusion, is overruled in Fox & Co. v. Glynn, 191 Mass. 344, 78 N. E. 89, 9 L. R. A. (N. S.) 1096, 114 Am. St. Rep. 619, wherein defendant was enjoined from copying the peculiar shape of plaintiff's loaves of bread.

From an examination of these cases it is evident that it would be unsafe to say as an abstract proposition either that a plaintiff may copy and offer in the market at will, and without notice, that which is not protected by patent or copyright, or that one who copies and offers for sale must always give notice that his copy is not the product of prior manufacturers. The object of the law of unfair competition is to prevent the palming off of goods as those of another, deception of the public, and trading on a reputation established by another.

In the present case the article involves both design and mechanical

structure, both of which the defendant may adopt, provided it does not seek to trade upon the reputation established by the complainant.

Upon the facts of this case I am of the opinion that the origin of the goods, the authorship of the design, or the reputation of the manufacturer have not been shown to be a matter of such interest to the public as to afford an inducement to the public to buy the plaintiff's goods rather than the goods of other manufacturers. Both in the matter of design and in the matter of function the article speaks for itself. It is not like a machine, with parts concealed or difficult to inspect, as to which the buyer relies, not upon his own judgment of quality or workmanship, but upon the name and reputation of a particular manufacturer as implying a representation of good workmanship and quality. Whether the article is made by the Bullard Bros. Company, by the Eisenstadt Manufacturing Company, by the Standard Button Company, or by Bates & Bacon, or possibly by other manufacturers, would seem to be a matter of indifference to the public, especially in view of the fact that the Bullard Bros. Company were first in the field and that the complainant itself gave notice that other persons were authorized manufacturers and distributors of the "Bob-o-link" bracelet.

The defendant has advertised itself as the manufacturer of its own product, and I am not satisfied that there is any attempt by the defendant to steal any of the reputation of the plaintiff as a manufacturer, or to avail itself of any desire of the public to have goods which are made by the Eisenstadt Manufacturing Company as distinguished from those made by any other company.

[2] In this particular case the real grievance, if it be a grievance, of the plaintiff seems to be that it has advertised the article extensively and has promoted and increased the demand for the article, and that the defendant, by supplying the market with the article in competition with the plaintiff, is reaping the benefit of the plaintiff's advertising, and thus, as counsel puts it, "is reaping where it has not sown."

A difficulty in the plaintiff's case, however, is that to a considerable extent this is true also of the plaintiff, as appears by the amendment to the bill and by the proofs. The scheme and the particular article had already been made known by newspaper articles and by traveling salesmen, and the plaintiff, in common with others, acquired its knowledge of the article in the ordinary course of an already established trade.

In the absence of any claim for protection under patent rights it is difficult to avoid the conclusion that the plaintiff stands merely in the situation of any other member of the public who may choose to disregard supposed patent rights, and to copy and promote the sale of an article that was already before the public and upon the market before the plaintiff adopted it.

The proofs do not show whether, as matter of fact, the defendant copied the article made by Bullard Bros. Company or that made by the plaintiff, nor does this seem to be of importance, for in either event the article in design and structure must be considered an old article of manufacture, and both plaintiff and defendant as copyists. If plaintiff's

and defendant's articles are so similar that one may be mistaken for another, it seems also true that both are likely to be mistaken for articles previously manufactured by Bullard Bros. Company.

[3] I am unable to see that it was possible for the plaintiff, after Bullard Bros. Company and Pratt had dedicated to the public all rights not protected by patents, or by applications 'for patents, and after Bullard Bros. Company, previously known as the manufacturers, had ceased to manufacture, to derive from Pratt or Bullard Bros. Company any exclusive rights, except patent rights.

The first copyist, by the claim that other copies may be mistaken for his copy, cannot abridge the rights of other copyists to follow the original design.

If we extend the established doctrine of trade dress, and say that the article itself may in some cases become a sign of authorship and origin, it could only lead to confusion if we should go further and follow this by saying that the best known manufacturer of copies, whose product may be even better known than the product of the original manufacturer, may enjoin others from copying because the public may be misled into buying the product of a later copyist as and for the product of an earlier copyist.

However, the argument that the distinctive appearance of the article itself may serve as a sign of origin does not seem applicable to the facts of this case.

The plaintiff has failed to show that the goods of its manufacture have in fact a distinctive appearance, which in itself points to the plaintiff as manufacturer. On the contrary, it appears that in appearance they are indistinguishable from those of an earlier manufacturer.

Whether a particular make of goods is exclusively associated in the mind of the public with a particular manufacturer is a matter of fact. Whether this association constitutes a substantial part of the inducement to buy these goods is also a matter of fact. It may be a matter of no practical consequence. That this defendant is profiting by the fact that the public mistakenly purchases its goods when they desire specially the plaintiff's does not seem to me to be established by the proofs.

The plaintiff insists that by advertising to the trade and to the public it has established a good will with which the defendant is interfering. It appears that a full-page advertisement in the Saturday Evening Post of May 22, 1915, of the plaintiff's links, under the plaintiff's name of "Bob-o-link," created a large demand, and that this was followed by other expensive advertisements.

The defendant, however, was in the field as a competitor before this, and as early as the middle of May seems to have been actively pushing its goods throughout the country. A demand for the article created by either party during competition naturally might inure to the benefit of either. There is this disadvantage in conducting an advertising campaign to promote the sale of an article which is not a proprietary article. But it is not inequitable for a defendant to profit by a general demand for old goods; it only is inequitable to seek to profit by supplying a special demand for goods of plaintiff's manufacture with goods

of the defendant's manufacture, thus trading on the plaintiff's reputation and deceiving the public.

[4] The plaintiff asks that the defendant be enjoined from making links of such size and design as adapt them to be used in connection with plaintiff's links to complete a bracelet.

It is shown that plaintiff's advertisements to the public represent that the purchaser of a requisite number of links will have the right to have them joined together without additional charge by connecting links supplied by the plaintiff to the jewelers, and it is urged that so far as defendant's links are purchased in place of plaintiff's, and so far as they are connected up by joining links supplied by plaintiff, the defendant is inequitably profiting by the plaintiff's offer to the public. Were the plaintiff the originator of both the scheme and the article, and had made promises to the public, so that the article had become a token of contract rights as well as a bracelet link, the case might present a different aspect, and involve questions of the law of tokens somewhat similar to those that arose in trading stamp cases. Sperry & Hutchinson Co. v. Mechanics' Clothing Co. (C. C.) 135 Fed. 833; Id. (C. C.) 128 Fed. 800; Bitterman v. Louisville & Nashville R. R., 207 U. S. 205, 222, 28 Sup. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693.

But there is no reason to believe that in fact the defendant is seeking to interfere with contracts between the plaintiff and the public in respect to this, or to profit by this promise by throwing upon the plaintiff the expense of connecting the defendant's links by use of plaintiff's connecting links. The defendant also supplies jewelers with such connecting links, and apparently follows the same plan that was used before the plaintiff entered the business. This must be regarded as one of the theoretical aspects of the case, rather than as a substantial matter.

Upon the whole case I am of the opinion that the defendant is not seeking to take advantage of the plaintiff's trade reputation, or of its reputation as a manufacturer, or to deceive the public by palming off its goods as the goods of the plaintiff. It has openly asserted its right to copy, and denied the plaintiff's right to a patent, or to a monopoly of the design. There has been some confusion of goods, but this results from the fact that both with equal right make the same article. The defendant's conduct does not, in my opinion, amount to fraud, actual or constructive; and if the defendant's competition interferes to some extent with the plaintiff's business scheme, this is merely because there is competition, and not because there is unfair or unlawful competition.

The bill will be dismissed.